*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 85**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

RICHARD BYLSMA and MELINDA BYLSMA,
*Appellants,*

*v.*

R.C. WILLEY, a Utah Corporation,
*Appellee.*

No. 20140484
Filed December 1, 2017

On Direct Appeal

Third District, West Jordan
The Honorable Barry G. Lawrence
No. 100414866

Attorneys:

Daniel F. Bertch, Kevin K. Robson, Salt Lake City,
for appellants

Jaryl L. Rencher, Clay W. Stucki, Benjamin Lusty, Salt Lake City,
for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUSTICE DURHAM and JUSTICE HIMONAS joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion, in which
JUSTICE PEARCE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1 This appeal requires us to consider whether the Liability Reform Act (LRA), Utah Code sections 78B-5-817 through 823, immunizes passive retailers from products liability claims in cases where the manufacturer is a named party. Richard and Melinda Bylsma asserted claims for strict products liability, breach of warranty, and contract rescission against R.C. Willey. The district

court dismissed the tort and warranty claims under the "passive retailer" doctrine as articulated by our court of appeals in *Sanns v. Butterfield Ford*.[1] R.C. Willey then stipulated to liability on the rescission claim and tendered payment of the purchase price. Both parties sought an award of attorney fees, but the district court denied their requests because it concluded that neither party had prevailed.

¶ 2 We conclude that the LRA does not create immunity for retailers, whether "passive" or not, and we therefore overrule our court of appeals' conclusion to the contrary in *Sanns*. In so doing, we hold that the LRA does not upend our longstanding precedent that retailers—just as distributors, wholesalers, manufacturers, and any others in the chain of distribution—are strictly liable for breaching their duty not to sell a dangerously defective product. To the contrary, the LRA reveals the legislature's intent to specifically preserve our strict products liability doctrine. We thus harmonize the relevant statutory language, avoid conflating the distinct legal doctrines of strict products liability and negligence, and honor the legislature's intent to retain the essential tenets of our strict products liability doctrine.

¶ 3 We accordingly reject the passive retailer doctrine and reverse the district court's dismissal of the Bylsmas' claims against R.C. Willey for strict products liability and breach of warranty. We also vacate the district court's decision declining to award attorney fees to the Bylsmas, and we remand for proceedings consistent with this opinion.

## Background

¶ 4 Melinda Bylsma purchased a reclining chair with a foot-massage attachment from R.C. Willey as a gift for her husband, Richard Bylsma.[2] Rather than delivering a soothing massage, the unit crushed his right foot.

¶ 5 The Bylsmas brought suit against R.C. Willey and Human Touch, the alleged manufacturer of the chair. They asserted three claims against R.C. Willey. First, they claimed that the chair was

---

[1] 2004 UT App 203, 94 P.3d 301.

[2] Because this is an appeal from a grant of a motion to dismiss, we construe the facts in the light most favorable to the Bylsmas, the non-moving parties. *See Gildea v. Wells Fargo Bank, N.A.*, 2015 UT 11, ¶ 3, 347 P.3d 385.

"unreasonably dangerous" in light of the risk of injury it presented. Second, they asserted a claim for breach of implied warranties of merchantability and fitness for a particular purpose under the Uniform Commercial Code (UCC). Finally, they sought rescission of their contract and restitution of the purchase price.

¶ 6 After more than a year of litigation, R.C. Willey moved to dismiss the Bylsmas' tort and warranty claims on the basis of its alleged immunity under the so-called "passive retailer" doctrine recognized in *Sanns v. Butterfield Ford*.[3] The Bylsmas opposed that motion. They challenged the passive retailer doctrine as incompatible with the Liability Reform Act (LRA), Utah Code sections 78B-5-817 through 823, and as infringing their rights under the Open Courts and Uniform Operation of Laws Clauses of the Utah Constitution.

¶ 7 The district court granted R.C. Willey's motion based on the passive retailer doctrine, dismissing the Bylsmas' tort and warranty claims, leaving only the claim for rescission of the contract. R.C. Willey then stipulated to liability on the rescission claim and tendered payment of the purchase price.

¶ 8 Both R.C. Willey and the Bylsmas sought to recover attorney fees under the terms of the security agreement entered into between them. Although that agreement expressly authorized only "costs of collection" incurred by R.C. Willey, the Bylsmas asserted a reciprocal right to fees under Utah Code section 78B-5-826. R.C. Willey opposed the Bylsmas' motion and also filed a cross-motion seeking an award of its own attorney fees. The district court denied the fee requests because it found that neither the Bylsmas nor R.C. Willey qualified as a "prevailing party."

¶ 9 The Bylsmas filed a timely notice of appeal, claiming error in the dismissal of their claims under the passive retailer doctrine and in the district court's refusal to grant their request for attorney fees. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

---

[3] 2004 UT App 203, 94 P.3d 301. Human Touch echoed an element of R.C. Willey's motion. It also claimed to be a passive seller and filed a notice of intent to apportion fault to the alleged manufacturers. The claims against Human Touch were resolved under a settlement agreement, so Human Touch's argument was not addressed by the district court and is not before us on this appeal.

**Standard of Review**

¶ 10 The Bylsmas raise two issues on appeal. The first is whether the district court erred in dismissing their tort and warranty claims. "We review a decision granting a motion to dismiss 'for correctness, granting no deference to the decision of the district court.' In so doing, we 'accept the plaintiff's description of the facts alleged in the complaint to be true, but we need not accept extrinsic facts not pleaded nor need we accept legal conclusions in contradiction to the pleaded facts.'"[4]

¶ 11 The second issue is whether the district court erred in denying the Bylsmas' motion for attorney fees under the reciprocal attorney fee statute, Utah Code section 78B-5-826. We review legal questions regarding the availability of attorney fees for correctness.[5] Where a statute or contract provides that attorney fees are to be awarded to a "prevailing party," we review a district court's determination of whether a party "prevailed" for an abuse of discretion.[6]

**Analysis**

¶ 12 We begin by reversing the district court's dismissal of the Bylsmas' strict products liability and breach of warranty claims. We do so based on our rejection of the court of appeals' conclusion in *Sanns v. Butterfield Ford*[7] and its progeny[8] that "passive retailers" are immunized from liability under the LRA in cases where the manufacturer is named in the suit. We correct the *Sanns* court's misreading of the LRA by noting that, because the statute preserves our strict products liability doctrine, retailers like R.C. Willey—along

---

[4] *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 13, 356 P.3d 1172 (citations omitted).

[5] *A.K. & R. Whipple Plumbing & Heating v. Guy*, 2004 UT 47, ¶ 6, 94 P.3d 270.

[6] *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119.

[7] 2004 UT App 203, 94 P.3d 301.

[8] *See McQuivey v. Fulmer Helmets, Inc.*, 2014 UT App 177, ¶ 8, 335 P.3d 361; *Yirak v. Dan's Super Mkts., Inc.*, 2008 UT App 210, ¶ 5, 188 P.3d 487.

with all others in a product's chain of distribution—are strictly liable for breaching their duty not to sell a dangerously defective product.[9]

¶ 13 We then provide guidance to the district court for how to proceed with these claims on remand. In particular, we clarify that the LRA's requirement that the fact-finder apportion "fault," which includes strict liability, does not require apportionment of fault *among* strictly liable defendants. Instead, the LRA requires that strictly liable defendants who all breached the same duty (a duty not to sell the same dangerously defective product) be treated as a single unit for purposes of fault allocation. We clarify that, to avoid conflating negligence and strict liability, the proper approach is one of "relative causation" rather than "relative fault."

¶ 14 Finally, we address the Bylsmas' argument regarding attorney fees. We vacate the district court's decision not to award attorney fees to the Bylsmas, first because our conclusion about the viability of the Bylsmas' tort and warranty claims necessarily changes the "prevailing party" calculus, but more fundamentally because we conclude that the district court erroneously considered whether the Bylsmas prevailed on claims other than the claim that was eligible for fee-shifting.

## I. The District Court Erred in Dismissing the Bylsmas' Tort and Warranty Claims Against R.C. Willey Because the LRA Does Not Create Immunity for Passive Retailers

¶ 15 This case presents our first opportunity to explain the interaction between strict products liability[10] and the LRA. We first

---

[9] The Bylsmas also argue that the LRA, if construed to create passive retailer immunity, violates the Utah Constitution's Open Courts and Uniform Operation of Laws Clauses. Because we reject such immunity, we do not reach these constitutional issues.

[10] As noted above, the Bylsmas also assert a claim for breach of two implied warranties under the UCC: the warranty of merchantability and the warranty of fitness for a particular purpose. *See* UTAH CODE § 70A-2-314(1) ("[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."); *id.* § 70A-2-315 ("Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next

(Continued)

discuss the LRA, concluding that both its text and context demonstrate the legislature's intent to retain the essential aspects of our strict products liability doctrine. We then discuss the nature of strict products liability, illuminating the key aspects of that doctrine that must continue to exist if we are to honor the legislative intent to retain it. With these principles in mind, we turn to an assessment of R.C. Willey's argument regarding passive retailer immunity, concluding that the LRA forecloses any such immunity. Finally, we provide guidance for the district court on remand by clarifying that the LRA does not require that the fact-finder apportion fault among strictly liable defendants who are liable for breaching the same duty. Instead, the LRA requires that strictly liable defendants who have breached the same duty be treated as a unit in the apportionment.

### A. *The Legislature Enacted the LRA to Eliminate Joint and Several Liability, but It Did Not Intend to Eliminate Our Strict Products Liability Doctrine*

¶ 16 We first explain how the LRA demonstrates that the legislature expressly intended to retain the key aspects of our strict

---

section an implied warranty that the goods shall be fit for such purpose."). The Bylsmas contend in their briefing that although "[t]he warranty field of product liability overlaps, but is definitely not coextensive with, tort liability," "the same analysis" applies to both tort and warranty claims insofar as the LRA does not create immunity for passive retailers under either theory. *See* UTAH CODE § 78B-5-817(2) (defining "fault" to include "breach of express or implied warranty of a product" as well as "strict liability" and "products liability"). R.C. Willey has not argued that the Bylsmas' breach of warranty claims should be analyzed differently from their strict products liability claim for purposes of determining passive retailer immunity. It, too, argues that the same analysis applies to both claims, stating in its brief that "[p]roducts liability law treats breach of warranty claims equivalently to tort claims." There is support in our cases for the proposition that "warranty" claims that seek damages for personal injury are essentially strict liability claims. *See Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 14 (Utah 1990) ("The term 'warranty' has . . . been used . . . in tort law to have a meaning that is synonymous with strict liability."). We therefore do not separately assess the Bylsmas' warranty claims, but we note that, in any event, the LRA does not create immunity for passive retailers under either theory, making dismissal of these claims improper.

products liability doctrine. We discern the legislature's intent by examining the history surrounding the LRA's passage, analyzing the statute's text, and considering its relationship with related statutory provisions.[11]

¶ 17 The LRA was expressly designed to eliminate joint and several liability.[12] Prior to the LRA, the Comparative Negligence Act stated that "the relative degrees of fault of the joint tort-feasors shall be considered in determining their prorata shares, solely for the purpose of determining their rights of contribution among themselves, each remaining severally liable to the injured person for the whole injury as at common law."[13] This was specifically repealed and replaced by the LRA—"An Act Relating to the Judicial Code; Modifying Provisions Relating to Comparative Negligence; Specifying Duties of Jurors and Judges; *Abolishing Joint and Several Liability* and Rights of Contribution Among Defendants; and Defining Certain Terms."[14] The LRA replaced joint and several liability with the requirement that "[n]o defendant is liable to any person seeking recovery for any amount in excess of the proportion of fault attributed to that defendant."[15] The legislature could have likewise ended strict products liability. Instead, it specifically chose to retain this common law doctrine.[16]

¶ 18 The LRA defines "fault" as "any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages" and expressly includes within its definition of "fault"

---

[11] *See State v. Rasabout*, 2015 UT 72, ¶ 10, 356 P.3d 1258.

[12] *See Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶¶ 82–83, 345 P.3d 619 (Nehring, A.C.J., dissenting).

[13] UTAH CODE ANN. § 78-27-40(2) (West 1973); *see also Jensen v. Intermountain Healthcare, Inc.*, 679 P.2d 903, 905–06 (Utah 1984).

[14] *Graves*, 2015 UT 28, ¶ 83 (Nehring, A.C.J., dissenting) (emphasis added) (emphasis omitted) (citation omitted).

[15] UTAH CODE § 78B-5-818(3).

[16] *See id.* § 78B-5-817(2); *see also* Jason R. Burt, Note, *The Effects of Judicial Immunization of Passive Sellers in* Sanns v. Butterfield Ford *and a Proposal for the Shifting Nature of Fault*, 2005 BYU L. REV. 477, 503 (2005) ("[N]o direct evidence indicates that the legislature ever intended to eliminate strict liability even in cases when a passive seller is found strictly liable.").

the claims that can be asserted based on a defective product: strict liability, breach of express or implied warranty, and products liability.[17] That same definition also includes the defenses against such claims: "misuse, modification, or abuse of a product."[18] These common law terms of art are used to define a statutory term— "fault." They are not themselves redefined or modified in any way by the LRA, meaning that the legislature intended to incorporate and preserve the claims and defenses of products liability as they were understood.[19] This conclusion is reinforced by another statutory scheme, the Product Liability Act (PLA).

¶ 19 The PLA's provisions presuppose the continued existence of a common law products liability doctrine because, while it adds a specific statute of limitation,[20] a definition of "unreasonably dangerous,"[21] a description of what constitutes a defect,[22] and recognizes that a product liability action may be filed "against a product manufacturer, wholesaler[,] or retailer,"[23] it does not itself create a products liability cause of action. Just like the LRA, the PLA references our products liability doctrine without changing or redefining any of the fundamental principles of that doctrine.[24]

---

[17] UTAH CODE § 78B-5-817(2).

[18] *Id.*

[19] *Kelson v. Salt Lake Cty.*, 784 P.2d 1152, 1156 (Utah 1989) ("[A]bsent express direction to the contrary, we presume that a term of art used in a statute is to be given its usual legal definition."); *see also* UTAH CODE § 68-3-11 ("Words and phrases are to be construed according to the context and the approved usage of the language; but technical words and phrases, *and such others as have acquired a peculiar and appropriate meaning in law*, or are defined by statute, are to be construed *according to such peculiar and appropriate meaning* or definition." (emphases added)); *Henry v. United States*, 251 U.S. 393, 395 (1920) ("The law uses familiar legal expressions in their familiar legal sense. . . .").

[20] UTAH CODE § 78B-6-706.

[21] *Id.* § 78B-6-702.

[22] *Id.* § 78B-6-703.

[23] *Id.* § 78B-6-704.

[24] Although the PLA was originally enacted prior to the LRA, it has been amended and reenacted several times since the passage of

(Continued)

These principles, which we describe below, have been specifically left untouched by the legislature and form the basis for these two statutory schemes. Nothing in the LRA or the PLA is either an express or implicit repudiation of products liability. Indeed, as we discuss below, both the LRA and the PLA are wholly consistent with our traditional strict products liability doctrine.

¶ 20 Because we interpret the provisions of a statute in the context of "the language of the act as a whole, the act's operation, and its purpose,"[25] our approach to reconciling strict products liability with the LRA must begin with our understanding of the legislature's clearly expressed intent to preserve strict products liability as it was understood in our law. To understand how to preserve the key aspects of our long-standing doctrine of strict products liability, it is first necessary to understand our strict products liability doctrine. We now turn to a discussion of how our products liability doctrine came into existence and how it has operated for the past several decades. We then interpret the LRA in such a way as to preserve the fundamental aspects of that doctrine.

*B. The Key Aspects of Strict Products Liability that the Legislature Intended to Retain Through the Passage of the LRA*

¶ 21 We now discuss the history of our strict products liability doctrine in some detail in order to illustrate the essential aspects of the doctrine. Strict products liability is a judicially created doctrine that began to take root in Utah at least as early as 1953.[26] In 1979, we

---

the LRA. Thus, the legislative intent expressed in the enactment of the PLA—that the strict products liability doctrine should continue to exist as we have articulated it in caselaw—is still relevant. *See Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982) ("A well-established canon of statutory construction provides that where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent.").

[25] *Rasabout*, 2015 UT 72, ¶ 10.

[26] *See Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 156 (Utah 1979) (discussing the history of strict products liability and citing *Hooper v. Gen. Motors Corp.*, 260 P.2d 549 (Utah 1953) and *Webb v. Olin Mathieson Chem. Corp.*, 342 P.2d 1094 (Utah 1959)).

formally adopted section 402A of the Restatement (Second) of Torts, which states:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> > (a) the seller has exercised all possible care in the preparation and sale of his product, and
> >
> > (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[27]

¶ 22 We adopted this doctrine to advance several compelling policy goals. "The liability was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society, and because of the limitations in the negligence and warranty remedies."[28] The doctrine operated to ensure "that the costs of injuries resulting from defective products are borne by the manufacturer that put such products on the market rather than by the injured persons who are powerless to protect themselves."[29]

¶ 23 There are three key aspects of our strict products liability doctrine that work together to achieve its goals. First, it imposes liability for harm caused by defective products without any regard to the culpability of the defendants, relieving the plaintiff of any requirement to demonstrate negligence. Second, it imposes this liability on every "seller" of the product—manufacturers, wholesalers, retailers, and any other party involved in the product's

---

[27] *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 402A (AM. LAW INST. 1965)).

[28] *Id.* at 157 (citation omitted).

[29] *Id.* (citation omitted).

chain of distribution—in order to ensure that a plaintiff will have a meaningful remedy. Third, it permits an "innocent" non-manufacturer (one who sold the product and was therefore held strictly liable) to recover its losses from the manufacturer by way of indemnity. The interplay between these three factors ensured both that the injured plaintiff would obtain a full recovery and that the costs were ultimately borne by those parties who "are in a position to absorb the loss by distributing it as a cost of doing business."[30] We next discuss each of these aspects in greater detail to demonstrate how our reading of the LRA is necessary to preserve these key aspects of our products liability doctrine.

1. Strict products liability eliminates any need for the plaintiff to demonstrate negligence in order to recover

¶ 24 The doctrine of products liability emerged "because of the limitations in the negligence and warranty remedies."[31] Indeed, "[t]he strict liability doctrine achieves its goals by 'reliev[ing] an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action.'"[32] These burdens were described by the Supreme Court of New Mexico:

> It is often difficult, or even impossible, to prove negligence on the part of the manufacturer or supplier. True, res ipsa loquitur often comes to the aid of the injured party. But it is normally regarded as a form of circumstantial evidence, and this means that there must be a logical inference of negligence which is sufficiently strong to let the case go to the jury. This is often not present, and strict liability eliminates the need of the proof.[33]

---

[30] *Azzarello v. Black Bros. Co.*, 391 A.2d 1020, 1023 (Pa. 1978), *overruled on other grounds by Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014).

[31] *Ernest W. Hahn*, 601 P.2d at 157 (citation omitted).

[32] *Anderson v. Owens-Corning Fiberglas Corp.*, 810 P.2d 549, 552 (Cal. 1991) (second alteration in original) (citation omitted).

[33] *Brooks v. Beech Aircraft Corp.*, 902 P.2d 54, 57–58 (N.M. 1995) (quoting John W. Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS. L.J. 825, 826 (1973)).

"An injured person . . . is not ordinarily in a position to refute . . . evidence [of due care] or identify the cause of the defect, for he can hardly be familiar with the manufacturing process as the manufacturer himself is."[34] Thus, as product liability developed over time, "the traditional elements of negligence[] were stripped from the remedy, and a new tort emerged which extended liability for defective product design and manufacture beyond negligence but short of absolute liability."[35]

¶ 25 Accordingly, in adopting section 402A of the Restatement, we deliberately created a cause of action based in neither contract nor negligence, but rather strict liability. Strict liability is, by definition, "liability without fault" or, in other words, liability without "blameworthiness in a moral sense."[36] "[C]ulpable conduct is not at issue in strict liability, only causation."[37] Strict liability "does not depend on proof of negligence or intent to do harm but . . . is based instead on a *duty to compensate* the harms proximately caused by the activity or behavior subject to the liability rule."[38]

¶ 26 In the context of strict products liability, we impose on a seller of a defective product the duty to compensate the harms resulting from the use of that product. The liability is "strict" because a seller of a defective product is liable even if "the seller has exercised all possible care in the preparation and sale of his product."[39] The seller's duty is not to sell a defective product—there is no analysis of due care or preventative measures. There is no room in a strict liability regime for the consideration of culpability— indeed, to do so would not only destroy what makes strict liability "strict," but also, in the context of products liability, undermine the very purposes of the doctrine. This aspect of our strict products

---

[34] *Escola v. Coca Cola Bottling Co. of Fresno*, 150 P.2d 436, 441 (Cal. 1944) (Traynor, J., concurring).

[35] *Ernest W. Hahn*, 601 P.2d at 157 (citation omitted).

[36] *Id.* at 156 (citation omitted); *see also Liability*, BLACK'S LAW DICTIONARY (10th ed. 2014) (stating that strict liability is "[a]lso termed *liability without fault*").

[37] *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301, 1304 (Utah 1981).

[38] *Liability*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added).

[39] *Ernest W. Hahn*, 601 P.2d at 156 (quoting RESTATEMENT (SECOND) OF TORTS § 402A(2)(a) (AM. LAW INST. 1965)).

liability doctrine goes hand-in-hand with the second—that liability is imposed on all sellers within a product's chain of distribution.

2. Strict products liability imposes the same liability on each party involved in a product's chain of distribution

¶ 27 Products liability imposes liability on anyone "who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property" so long as "the seller is engaged in the business of selling such a product."[40] This includes "any manufacturer" and "any wholesale or retail dealer or distributor."[41] Thus, so-called passive retailers and wholesalers are liable to the exact same extent as the manufacturer. The reason for including all sellers of a product within the ambit of strict products liability is two-fold: first, it ensures that the injured plaintiff has a party from whom she can recover and, second, it protects future consumers by incentivizing manufacturers to create safe products and retailers to deal with responsible manufacturers.

¶ 28 The imposition of strict liability on all sellers ensures that an injured plaintiff is "provided with an alternative remedy in the event that the manufacturer is insolvent, out of business, or so remote that it is either impossible to obtain jurisdiction or unduly burdensome to bring suit."[42] By holding each seller of a defective product equally and strictly liable, a plaintiff is guaranteed that at least one party—most likely the local retailer—will be known to the plaintiff, amenable to suit, and likely solvent at the time of judgment.[43] To

---

[40] *Id.* (citation omitted).

[41] RESTATEMENT (SECOND) OF TORTS § 402A cmt. f (AM. LAW INST. 1965); *see also* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 1 cmt. e (AM. LAW INST. 1998) ("The rule stated in this Section provides that all commercial sellers and distributors of products, including nonmanufacturing sellers and distributors such as wholesalers and retailers, are subject to liability for selling products that are defective. Liability attaches even when such nonmanufacturing sellers or distributors do not themselves render the products defective and regardless of whether they are in a position to prevent defects from occurring.").

[42] *Brooks*, 902 P.2d at 58.

[43] *See* William L. Prosser, *The Assault upon the Citadel (Strict Liability to the Consumer)*, 69 YALE L.J. 1099, 1116–17 (1960) ("There are other sellers than the manufacturer of the product. It will pass

(Continued)

allow retailers to avoid liability, regardless of the manufacturers' solvency, could foreclose any recovery at all and allow retailers to benefit from the sale of a defective product without bearing any of the associated cost. Strict products liability was specifically designed to ensure that an injured plaintiff's recovery was not based on or otherwise limited by whether one particular entity in a product's chain of distribution, such as a foreign manufacturer, would be solvent and amenable to suit. Accordingly, the doctrine permits recovery for injuries caused by defective products against the local retailer, importer, or wholesaler to the same extent as against the manufacturer.

¶ 29 The second policy goal served by the imposition of liability on all sellers of a product is to create incentives that protect future consumers. As the Wisconsin Supreme Court stated, "one of the primary policies underlying products liability law is to encourage manufacturers to produce safer products."[44] Products liability does this by imposing on manufacturers the burden of paying for the injuries caused by their defective products. But this incentive scheme falls apart when the manufacturer cannot be held liable.[45]

---

through the hands of a whole line of other dealers, and the plaintiff may have good reason to sue any or all of them. The manufacturer is often beyond the jurisdiction. He may even, in some cases, be unknown. . . . [Or] he may turn out, in these days of chain stores and large supply houses, to be a small concern, operating on a shoestring, and financially the least responsible person in the whole chain of distribution. If the plaintiff is to recover at all, he must often look to the wholesaler, the jobber, and the retailer." (footnotes omitted)).

[44] *Green v. Smith & Nephew AHP, Inc.*, 629 N.W.2d 727, 744 (Wis. 2001).

[45] *See, e.g.*, Stephanie Glynn, Comment, *Toxic Toys and Dangerous Drywall: Holding Foreign Manufacturers Liable for Defective Products—The Fund Concept*, 26 EMORY INT'L L. REV. 317, 326–27 (2012) ("Quality control issues that accompany Chinese-made products are passed along to U.S. consumers, along with the cheap prices. . . . Judge Richard Posner's accident reduction theory suggests actors will forego preventative measures when the cost of accidents, and therefore the cost of liability, is less than the cost of prevention. Chinese manufacturers can evade economic and legal liability; therefore, they have no financial incentive to install preventative measures. As a result, the price of their goods fails to account for

(Continued)

Accordingly, we hold passive sellers as liable as the manufacturers in order to incentivize the sellers "to select reputable and responsible manufacturers who generally design and construct safe products and who generally accept financial responsibility for injuries caused by their defective products."[46] Thus, we ensure "that the costs of injuries resulting from defective products are borne by the [sellers] that put such products on the market rather than by the injured persons who are powerless to protect themselves."[47]

¶ 30 Ultimately, when we adopted the doctrine of strict products liability, we also decided that retailers and manufacturers "should absorb the inevitable losses which must result in a complex civilization from the use of their products, because they are in the better position to do so, and through their prices to pass such losses on to the community at large."[48] We enacted this policy by creating a strict liability regime that imposes liability on each party within a product's chain of distribution without requiring proof of any wrongful or negligent conduct. By so doing, we have also made non-manufacturers a conduit through which liability flows to the manufacturer, as discussed below.

3. Strict products liability employs implied indemnity to allocate the burden of loss as between defendants

¶ 31 Courts have recognized the potential "inequity of requiring a retailer or distributor to bear the cost of injury created by a manufacturer"[49] and have held that, at least as between a manufacturer and retailer, "the obligation ought to be discharged by

---

products liability risks." (footnotes omitted)); George L. Priest, *Lawyers, Liability, and Law Reform: Effects on American Economic Growth and Trade Competitiveness*, 71 DENV. U. L. REV. 115, 147 (1993) ("To the extent that foreign manufacturers can discount the collectibility of U.S. products liability judgments, however, their prices can be set commensurately lower. If they do not face equal prospects of punitive damages levies, then they need not invest in excessive levels of safety, as must U.S. manufacturers.").

[46] *Brooks*, 902 P.2d at 58.

[47] *Ernest W. Hahn*, 601 P.2d at 157 (citation omitted).

[48] Prosser, *supra* note 43, at 1120.

[49] *Durden v. Hydro Flame Corp.*, 983 P.2d 943, 946 (Mont. 1999).

the more culpable party."[50] In order to alleviate this potential inequity while still providing injured parties with a viable remedy, we have adopted the doctrine of implied indemnity.

¶ 32 Implied indemnity is a doctrine applying in a limited number of scenarios that shifts the entire burden of a plaintiff's loss from a non-culpable party to a culpable party.[51] This is the only place where culpability factors into the products liability equation at all—on the back end, after the plaintiff has fully recovered. A right to implied indemnity "is based on a theory of quasi-contract or contract implied in law"[52] and flows from "the relationship between the parties."[53] It applies in principal/agent[54] and strict products liability situations,[55] where principles of vicarious liability impose on a non-culpable party the liability incurred by a culpable one.[56] In the context of strict products liability, "[t]hrough the equitable concept of implied indemnity, the retailer-indemnitee is prevented from

---

[50] *Hanover Ltd. v. Cessna Aircraft Co.*, 758 P.2d 443, 445 (Utah Ct. App. 1988) (citing *Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214, 218 (Utah 1984)).

[51] *See id.*

[52] *Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 19 (Utah 1990).

[53] *Hanover*, 758 P.2d at 446.

[54] *Culmer v. Wilson*, 44 P. 833, 836 (Utah 1896) ("[T]he law will imply an indemnity to such agent who believed as his principal did, and who acted in good faith, and was innocent of any wrongful intent or purpose, for any damages he was made to pay on account of such act done in pursuance of his principal's direction, within the scope of his instructions and employment.").

[55] *See, e.g.*, *Davidson Lumber*, 794 P.2d at 12.

[56] *See, e.g.*, *Nelson ex rel. Hirschfeld v. Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 935 P.2d 512, 513 (Utah 1997) (stating that an employer's vicarious liability "'arises not as a result of actual negligence by the employer,' but because the employer reaps the benefits of the employee's acts and may more easily spread the costs of accidents" (citation omitted)); RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. § 13 cmt. a (AM. LAW INST. 2000) ("Retailers and other nonmanufacturer sellers of products may be held strictly liable for a defect attributable to the manufacturer, in effect imposing vicarious liability on the retailer.").

being held derivatively or vicariously liable for the wrongful act of the manufacturer-indemnitor" because the retailer can pass its loss along to the manufacturer.[57]

¶ 33 Accordingly, our strict products liability doctrine allows "strict liability against 'downstream' parties (without proof of fault) in order to allow them to act as a conduit to pass liability 'upstream' to the manufacturer."[58] And this "'upstream' indemnification fosters the policy behind strict products liability by placing final responsibility for injuries caused by a defective product upon the entity initially responsible for placing that product into the stream of commerce."[59] Indeed, our doctrine has embraced the notion that "in the absence of imposition of liability on the 'upstream' manufacturer, the manufacturer would have little economic incentive to remove a defective product from the market."[60] Thus, whereas the purpose of products liability generally is to shift the burden of loss from an injured party to the sellers of a defective product as a collective whole, the purpose of implied indemnity is to shift the burden from an individual passive retailer—who bears no fault in the usual sense of the word—onto the party responsible for the defect, the manufacturer.[61]

---

[57] *Hanover*, 758 P.2d at 446.

[58] *Durden*, 983 P.2d at 946.

[59] *Id.* (citation omitted).

[60] *Id.* ("[Although] the retailer or distributor could always refuse to order that product in the future, . . . the economic effect on the manufacturer of the loss of these few sales would be extremely limited and have little impact. . . . [W]ithout indemnification, the retailer or distributor might also suffer financial disaster merely because it unknowingly sold a defective product. Indemnity shifts full responsibilities for injury to the manufacturer and provides an incentive to the manufacturer to withdraw or correct the defective product.").

[61] *See Hanover*, 758 P.2d at 446. Of course, as discussed above, there may be times where the manufacturer is not amenable to any kind of suit, including one for indemnity, because it is beyond the court's jurisdiction, unknown, or insolvent. In these cases, we have a choice of imposing the burden of loss on the injured plaintiff or the "passive" retailer. And as discussed above, we have chosen to

(Continued)

¶ 34 There is a crucial distinction between the liability involved in a products liability claim and that in an implied indemnity claim. As discussed, a products liability claim can be asserted by a plaintiff against any of the sellers of a particular defective product, and the plaintiff is not required to show culpability on the part of any of the defendants. An implied indemnity claim, on the other hand, permits a seller of a product who was held strictly liable to recover its loss from a more culpable seller—typically the manufacturer.[62] An implied indemnity claim, which has nothing to do with either the plaintiff's claim or her recovery, is the only context in which the culpability of a seller of a defective product enters into the strict liability picture. Thus, all sellers of a defective product are equally and strictly liable vis-à-vis *the plaintiff*—liability without fault—but are liable vis-à-vis *other sellers* "based upon their respective culpability"[63]—fault-based liability.

¶ 35 These three aspects of our products liability doctrine—liability without fault, imposed equally upon all sellers of a product, with recourse available for a passive retailer to shift the burden of loss onto a manufacturer—are the long-established foundational tenets of our products liability doctrine. Together, they honor the overarching purposes of products liability: to protect consumers and shift the risk of loss onto those best equipped to bear it. We next turn to interpreting the LRA in a way that respects the legislative intent to preserve this doctrine.

*C. The Passive Retailer Doctrine Cannot Stand Because It Is Inconsistent with the LRA and Our Strict Products Liability Doctrine*

¶ 36 We first articulate R.C. Willey's argument that the LRA should be read to create passive retailer immunity from products liability claims. We then articulate the similar reasoning employed

---

impose that burden on retailers in order to incentivize them to work with responsible manufacturers.

[62] Despite this being the usual case, there may be instances where a manufacturer seeks indemnity from a retailer. *See* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 2 cmt. c (AM. LAW INST. 1998) ("When the manufacturer delegates some aspect of manufacture, such as final assembly or inspection, to a subsequent seller, the manufacturer may be subject to liability under rules of vicarious liability for a defect that was introduced into the product after it left the hands of the manufacturer.").

[63] *Hanover*, 758 P.2d at 445.

by the court of appeals in *Sanns v. Butterfield Ford*.[64] We also set forth the argument advanced by the concurrence. We then describe how these arguments ultimately fail and, in particular, the ways each fails to preserve the essential aspects of our strict products liability doctrine.

¶ 37 The Bylsmas assert a claim against R.C. Willey for strict products liability,[65] alleging that the chair sold by R.C. Willey contained an "unreasonably dangerous" defective condition that was present upon its sale and that caused them damages.[66] R.C. Willey asserts that this claim must be dismissed because the LRA creates immunity for passive retailers in cases where the manufacturer is also named in the suit. We first describe the passive retailer doctrine, which is largely driven by our court of appeals' decision in *Sanns*. We then explain why this doctrine conflicts with the core elements of our strict products liability doctrine, and so is incompatible with the legislature's intent to retain that doctrine.

¶ 38 We start with the statutory text that drives R.C. Willey's passive retailer argument. As discussed above, the LRA sets "the maximum amount for which a defendant may be liable to any person seeking recovery" at "that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant,"[67] and it provides that "[n]o defendant

---

[64] 2004 UT App 203, 94 P.3d 301.

[65] As discussed above, the Bylsmas also assert a breach of warranty claim, where they assert that R.C. Willey breached two implied warranties under the UCC. *See supra* ¶ 15 n.10. We note that the interpretation of the LRA discussed above forecloses the possibility of passive retailer immunity for breach of warranty claims. But because the parties have not presented arguments about how, if at all, the allocation of fault would differ as between the strict liability and breach of warranty claims in this case, we do not address that question here.

[66] *See Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 2003 UT 43, ¶ 16, 79 P.3d 922 (describing the element of strict products liability as (1) "a defect or defective condition of the product made it unreasonably dangerous, (2) that defect was present at the time of the product's sale, and (3) that the defective condition was the cause of the plaintiff's injuries").

[67] UTAH CODE § 78B-5-820(1).

is liable to any person seeking recovery for any amount in excess of the proportion of fault attributed to that defendant."[68]

¶ 39 R.C. Willey argues that these provisions mandate passive retailer immunity. Because a passive retailer had a common law right of indemnity against the manufacturer, as discussed above, R.C. Willey asserts that the equitable "percentage or proportion of fault" to be attributed to such a passive retailer under Utah Code section 78B-5-820(1) must always be zero. And because no defendant may be liable "for any amount in excess of the proportion of fault attributed to that defendant,"[69] the LRA (in R.C. Willey's view) effectively codifies a principle of immunity for passive retailers.

¶ 40 R.C. Willey supports this argument by contending that the LRA expressly forecloses an action for implied indemnity by the retailer against the manufacturer. It first cites Utah Code section 78B-5-820(2), which provides that "[a] defendant is not entitled to contribution from any other person." It also relies on Utah Code section 78B-5-823, which states that "[n]othing in Sections 78B-5-817 through 78B-5-822" of the Act "affects or impairs any right to indemnity or contribution arising from statute, contract, or agreement." Together, in R.C. Willey's view, these provisions combine to "establish[] a scheme by which subsequent lawsuits to fairly distribute liability among joint tortfeasors" are prohibited.

¶ 41 This argument asks us to read the statute's reference to "contribution" as encompassing all subsequent claims for equitable distribution of liability—including implied indemnity. R.C. Willey claims that the distinction between "contribution" and "indemnity" "faded" over time in the case law, citing *National Service Industries v. B.W. Norton Manufacturing Co.*[70] And it accordingly urges us to read the LRA's prohibition of claims for "contribution" to encompass "claims for implied indemnity and common law contribution." It also views that approach as reinforced by Utah Code section 78B-5-823 because that provision preserves only rights of "indemnity or contribution *arising from statute, contract, or agreement*,"[71] so R.C. Willey views it as prohibiting (by negative implication) any rights of indemnity or contribution *arising in the common law*.

---

[68] *Id.* § 78B-5-818(3).

[69] *Id.*

[70] 937 P.2d 551, 555 (Utah Ct. App. 1997).

[71] UTAH CODE § 78B-5-823 (emphasis added).

¶ 42 R.C. Willey further argues that if the retailer lacks the ability to protect itself in a separate action for implied indemnity, it will inevitably be left with liability in excess of its proportionate share. Thus, R.C. Willey insists that passive retailer immunity is essential to preserving the core elements of the LRA. It claims that such immunity is the only way to preserve the legislative prohibition on a defendant being liable for any amount exceeding its equitable proportion of fault.

¶ 43 The *Sanns* decision followed a similar line of analysis. There, the court of appeals asserted that the purpose of the LRA was to "attempt to ensure that parties are not held unfairly liable to an extent greater than their degree of fault."[72] And, citing an opinion of this court invoking legislative history, the court of appeals also suggested that the Act was aimed at "basic fairness," or, in other words, at assuring that a "defendant ought to be on the hook only for its own percentage of damages, but ought not be the guarantor for everyone else's damages."[73]

¶ 44 For this reason, the *Sanns* court interpreted the LRA to foreclose product liability for a mere passive retailer in a suit in which the manufacturer is named. It based that decision on two core elements of the LRA: (a) the proviso that no tortfeasor is liable for any amount in excess of the proportion of fault attributed to that defendant; and (b) the purported elimination of the right to assert a common law claim for contribution or implied indemnity.[74]

¶ 45 Because, in the *Sanns* court's view, "[t]he strict liability 'fault' . . . , if any, lies with the manufacturer" and not the passive retailer, the passive retailer doctrine is necessary to protect the retailer from being saddled "with some or all of the fault actually belonging" to the manufacturer.[75] Thus, in a case in which both the manufacturer and a passive retailer are named as defendants, the *Sanns* court held that the latter is entitled to dismissal on immunity grounds. "[A]s long as [the manufacturer] is present in the suit," in other words, the *Sanns* court held that there was "no reason to

---

[72] *Sanns*, 2004 UT App 203, ¶ 19 (citation omitted).

[73] *Id.* (quoting *Sullivan v. Scoular Grain Co.*, 853 P.2d 877, 880 (Utah 1993)).

[74] *See id.* ¶ 21.

[75] *Id.*

require" the passive retailer "to incur the time and expense of defending" against a product liability suit.[76]

¶ 46 The concurrence in this case makes a different argument for interpreting these same provisions of the LRA, but its approach, too, fails to maintain the essential aspects of our strict products liability doctrine. The concurrence agrees that the LRA forecloses passive retailer immunity, but the approach it advocates would essentially create a more expansive form of retailer immunity. The concurrence argues that each entity in a product's chain of distribution must be apportioned a separate amount of "fault." Under this view, the fact-finder must apportion fault among equally strictly liable defendants—multiple defendants who all breached the same duty not to sell a dangerously defective product. Like R.C. Willey and the *Sanns* court, the concurrence also reads the LRA to foreclose actions for implied indemnity.

¶ 47 We reject these approaches as being incompatible with the legislature's express retention in the LRA of our strict products liability doctrine. As discussed above, there are three central interrelated principles that make up our strict products liability doctrine: (1) the liability involved is strict and not based on culpable conduct; (2) from the point of view of the plaintiff, this liability is imposed equally on each party within a product's chain of distribution; and (3) non-culpable sellers of a defective product may seek indemnity from the manufacturer. These are the doctrines that were specifically preserved and incorporated into both the LRA and the PLA.

¶ 48 Despite this legislative intent to retain the strict products liability doctrine, the passive retailer doctrine and the concurrence's version of passive retailer immunity eviscerate each one of its essential elements: they conflate strict liability with negligence, importing notions of culpability that are not only foreign to a strict liability regime, but are also conceptually incompatible with any definition of strict liability. The passive retailer doctrine distinguishes between "passive" and "active" sellers of products, but doing so is incompatible with our adoption of section 402A of the Restatement (Second) of Torts and its equal imposition of strict liability on all sellers of a defective product. Finally, these arguments rely on an incorrect premise: each equates the doctrines of contribution and implied indemnity, failing to recognize the

---

[76] *Id.*

distinction between both the bases and applications of each doctrine, and accordingly concludes that they have both been foreclosed by the LRA.

1. The passive retailer doctrine incorporates considerations of culpability into a strict liability doctrine

¶ 49 As discussed above, when we adopted section 402A of the Restatement (Second) of Torts, which sets forth the doctrine of strict products liability, we adopted its strict liability regime for products liability claims.[77] Because strict liability is, by definition, "liability without fault,"[78] "culpable conduct is not at issue in strict liability, only causation."[79] Having adopted section 402A, we impose liability on sellers even if "the seller has exercised all possible care in the preparation and sale of his product."[80] The seller's duty is not to sell a defective product—any sale of a defective product breaches this duty, regardless of the care taken by the seller. There is no understanding of strict products liability that makes liability turn on the culpability of a retailer or manufacturer. And yet, this is exactly what the passive retailer doctrine does.

¶ 50 In creating the passive retailer doctrine, the *Sanns* court purported to recognize the difference between strict liability and negligence,[81] but its analysis reveals that it failed to apply the distinction. The court reasoned that, because "[the passive retailer] did not participate in the design, manufacture, engineering, testing, or assembly" of the product, "[t]he strict liability 'fault' . . . , if any, lies with the manufacturer, not with . . . the passive retailer."[82] The

---

[77] *See Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 156–57 (Utah 1979).

[78] *Id.* at 156 (citation omitted).

[79] *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301, 1304 (Utah 1981).

[80] RESTATEMENT (SECOND) OF TORTS § 402A(2)(a) (AM. LAW INST. 1965).

[81] *See Sanns*, 2004 UT App 203, ¶ 14 n.5 ("The use of strict liability in this statutory definition should be viewed only as a cause of action subject to the [LRA], rather than changing the traditional use of the term *fault* to somehow include strict liability, a liability concept that is unconcerned with fault in the usual sense of culpability." (emphasis added)).

[82] *Id.* ¶ 21.

court then concluded that because the LRA "eliminated all aspects of joint and several liability, . . . strict liability cannot be apportioned to . . . a passive seller[ ] and also to" a manufacturer.[83]

¶ 51 But this analysis mixes negligence and strict liability by implicitly assuming that "fault" under the LRA—a term that incorporates but does not redefine strict products liability—necessarily depends on culpability. No provision of the LRA, however, requires an analysis of culpability instead of strict liability. "Fault" under the LRA encompasses a number of different legal duties, from a duty of due care (negligence)[84] to a duty "to refrain from committing intentional torts."[85] The only "fault" at issue in strict products liability cases—the only "actionable breach of [a] legal duty"[86]—is a breach of the duty not to sell a defective product. There is no culpability involved, no duty of care that must be evaluated. A seller of a product breaches its duty by selling a defective product, not by failing to take action to prevent either the defect or the sale of the product in the first place.[87] The inclusion of strict liability within the definition of "fault" in the LRA does not mean that strict liability claims must turn on principles of negligence, as the *Sanns* court implicitly concluded. Instead, the *Sanns* court was correct when it noted that the legislature's "use of strict liability in this statutory definition should be viewed only as a cause of action subject to the [LRA], rather than changing the traditional use of the term *fault* to somehow include strict liability, a liability concept that is unconcerned with fault in the usual sense of culpability."[88]

¶ 52 It is vitally important to recognize that the LRA does not redefine the doctrine of strict products liability. Instead, it includes within its definition of "fault" the breach of a legal duty. This is completely consistent with strict products liability, which the statute

---

[83] *Id.*

[84] *See* UTAH CODE § 78B-5-817(2) (including within the definition of "fault" "negligence in all its degrees").

[85] *Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 50, 345 P.3d 619.

[86] UTAH CODE § 78B-5-817(2).

[87] *See Ernest W. Hahn*, 601 P.2d at 156 (holding that strict products liability applies even though "the seller has exercised all possible care in the preparation and sale of his product" (quoting RESTATEMENT (SECOND) OF TORTS § 402A(2)(a) (AM. LAW INST. 1965))).

[88] *Sanns*, 2004 UT App 203, ¶ 14 n.5 (emphasis added).

specifically preserves. The duty at issue in strict products liability cases is the duty not to sell a defective product. Thus "fault" under the LRA does not mean only breach of the duty of due care—negligence—but also includes non-negligent breaches of a duty—such as the duty not to sell a defective product, which is a duty shared by all sellers of products.

¶ 53 Accordingly, the *Sanns* court's reasoning redefined strict products liability without legislative direction or intent and failed to recognize that there is no distinction between the conduct of retailers and manufacturers that subjects them to liability, thus contradicting our prior opinions on this topic[89] as well as the LRA itself. The essential conduct—the "fault"—is whether an unreasonably dangerous product was sold, and this inquiry does not turn on whether a party could have acted to prevent the injury. There is no distinction between retailers' and manufacturers' conduct as it is the same conduct—selling a product.

¶ 54 The problem with the *Sanns* court's approach is that the LRA specifically preserves strict products liability. Yet stripped of its imposition of "strict" liability—liability without fault, based on a breach of a legal duty not to sell a defective product—it is no longer the doctrine of strict products liability. Strict products liability is designed to relieve the plaintiff of any requirement to show negligence in order to recover. The *Sanns* court turned this principle on its head, concluding that, in cases where the manufacturer is present in the suit, any retailer who did not take part in the "design, manufacture, engineering, testing, or assembly" of the product cannot be said to have "fault." This result is wholly at odds with the principle that "the liability of nonmanufacturing sellers in the distributive chain is strict. *It is no defense that they acted reasonably* and did not discover a defect in the product, be it from manufacturing, design, or failure to warn."[90] Ultimately, it appears that the *Sanns* court read the LRA's statement that "[n]o defendant is liable to any person seeking recovery for any amount in excess of the proportion

---

[89] *See Ernest W. Hahn*, 601 P.2d at 156; *see also Graves*, 2015 UT 28, ¶ 62 (holding that the LRA "shifted the focus from *apportionment of comparative negligence* to the task of 'assigning the relative responsibility' based on 'relative fault and relative causation.'" (emphasis added) (citation omitted)).

[90] RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 1 cmt. a (AM. LAW INST. 1998) (emphasis added).

of fault attributed to that defendant" as expressing the legislative intent to fundamentally redefine strict products liability.[91] We disagree.

2. The passive retailer doctrine relieves non-manufacturer sellers of their liability to plaintiffs

¶ 55 In adopting section 402A, we elected to impose on all sellers of a product—retailers, wholesalers, distributors, and manufacturers—an equally shared liability. This aspect of products liability "protect[s] the ultimate consumer"[92] by ensuring that at least one party will be amenable to suit and likely solvent. It acts "as a deterrent and a method of allocating the risk of loss among those best equipped to deal with it."[93] These principles have been completely undermined by the *Sanns* court's approach.

¶ 56 The *Sanns* court concluded that the "[t]he strict liability 'fault' . . . , if any, lies with the manufacturer, not with . . . the passive retailer."[94] But this distinction between "passive" retailers and "active" manufacturers directly contradicts our adoption of section

---

[91] The concurrence's proposed approach suffers from the same defect. By requiring apportionment among equally strictly liable defendants, the concurrence's approach would necessarily import considerations of culpability into a strict products liability claim, which, for reasons we have explained, is incompatible with the very essence of such a claim. The concurrence uses the example of a duty to warn claim—another strict liability action that applies to both retailers and manufacturers—as an example of a time when a retailer may bear "at least some proportion of fault." *Infra* ¶ 127. The concurrence states that "[a] factfinder could easily conclude that a retailer is in as good or a better a position to warn." *Infra* ¶ 127. In so doing, the concurrence is necessarily suggesting that what is at issue in these "strict" liability cases is, in fact, culpable conduct—who should have acted to prevent the harm. But the concurrence does not explain why the LRA should be interpreted as redefining strict products liability in a way that departs from our long-standing approach, which makes culpability irrelevant in a strict products liability claim.

[92] *Ernest W. Hahn*, 601 P.2d at 157 (citation omitted).

[93] *Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 2003 UT 43, ¶ 32, 79 P.3d 922.

[94] 2004 UT App 203, ¶ 21.

402A and the legislature's preservation of products liability in the LRA.[95] The restatement does not distinguish between retailers and manufacturers at all: it applies liability equally to any "seller" of a product, as discussed above.[96] Our legislature has likewise recognized that a products liability claim can be asserted against "a product manufacturer, wholesaler[,] or retailer."[97] By holding each party equally responsible for its conduct in selling a defective product, the plaintiff is protected because among all of the parties included within a product's chain of distribution, at least one—most often the local retailer—will be amenable to suit and likely solvent.[98]

¶ 57 The *Sanns* court concluded that a passive retailer should be dismissed from a products liability action so long as the manufacturer "is named in the suit."[99] But allowing a retailer to be immediately dismissed is irreconcilable with our adoption of section 402A and with the LRA's express direction that our strict products liability doctrine be preserved. Adopting this immunity would have three results: first, we would effectively overrule our adoption of the Restatement, which imposes equal liability on anyone "who sells any product in a defective condition" so long as "the seller is engaged in

---

[95] Indeed, as one commentator noted, *Sanns*'s "logic can succeed only if strict liability no longer connotes an absolute duty and instead equates to culpability[,] . . . [which requires an] implicit[] reject[ion] [of] the doctrines of Section 402A in cases involving a passive seller and a manufacturer." Burt, *supra* note 16, at 505–06.

[96] *See* RESTATEMENT (SECOND) OF TORTS § 402A(1) (AM. LAW INST. 1965); RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 1 cmt. e (AM. LAW INST. 1998) ("[A]ll commercial sellers and distributors of products, including nonmanufacturing sellers and distributors, such as wholesalers and retailers, are subject to liability for selling products that are defective.").

[97] *See* UTAH CODE § 78B-6-704.

[98] *See Ernest W. Hahn*, 601 P.2d at 157 ("The liability was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society, and because of the limitations in the negligence and warranty remedies." (citation omitted)).

[99] 2004 UT App 203, ¶ 22.

the business of selling such a product."[100] Second, it would shift the cost of the injury resulting from defective products from retailers and manufacturers—those that we have long recognized as being best equipped to absorb such costs by creating safer products, contracting with more responsible parties, and spreading the loss to the public at large—onto injured parties in cases where the manufacturer is incapable of satisfying a judgment. If a retailer is dismissed from a suit on the grounds of "immunity," then the plaintiff cannot recover the "alternative remedy" provided by strict products liability "in the event that the manufacturer is insolvent."[101] Third, we would greatly weaken the incentive scheme created by products liability. With a passive retailer doctrine in place, retailers would have significantly diminished incentive to work with responsible, solvent manufacturers who produce safe products because, so long as they choose a manufacturer who is capable of being "named in the suit," the retailers would be entitled to be dismissed from any product liability claims. We cannot accept these results where the legislature has specifically retained our strict products liability doctrine in the LRA.

¶ 58 Ultimately, not only is there no basis in the substantive law of product liability in tort to categorically exempt passive retailers from responsibility, there is no basis in the substantive law of products liability to limit passive retailers' responsibility at all. Under the substantive law of products liability, retailers and manufactures have an equal, indivisible share of "fault"—the breach of the duty not to sell a defective product.[102] And there is no support for the notion that the legislature, by way of a broadly worded provision requiring the allocation of a broadly defined understanding of "fault" intended to redefine strict products liability in such a drastic way. The legislature defined "fault" in a way that is wholly consistent with our products liability doctrine. We see no

---

[100] *See supra* note 41; RESTATEMENT (SECOND) OF TORTS § 402A(1) (AM. LAW INST. 1965).

[101] *Brooks v. Beech Aircraft Corp.*, 902 P.2d 54, 58. (N.M. 1995).

[102] *See* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIAB. § 26 cmt. g (AM. LAW INST. 2000) ("Damages are indivisible, and thus the injury is indivisible, when all legally culpable conduct of the plaintiff and every tortious act of the defendants and other relevant persons caused all the damages.").

basis for relying on such a definition to so substantially modify the key tenets of strict products liability.

3. The *Sanns* court conflated contribution with implied indemnity and foreclosed both

¶ 59 R.C. Willey's argument, like our court of appeals' decision in *Sanns* and the concurrence in this case, is largely driven by the mistaken conclusion that the LRA foreclosed actions for implied indemnity. We now explain why it did no such thing.

¶ 60 The *Sanns* court held that implied indemnity actions have been foreclosed by the LRA.[103] It is true that the LRA requires a unitary determination of comparative fault, encompassing not just parties to the suit but any individual who can be identified and for whom there is a "factual and legal basis to allocate fault."[104] This means there is to be a single, unitary proceeding for allocating comparative fault. But implied indemnity actions do not reallocate comparative fault. To conclude that implied indemnity actions reallocate fault is to conflate implied indemnity with contribution. Because of this conflation, the *Sanns* court held that implied indemnity actions are foreclosed by the LRA.

¶ 61 The two relevant statutory provisions dealing with contribution and implied indemnity under the LRA are sections 78B-5-820(2) and 78B-5-823. Section 820(2) states that "[a] defendant is not entitled to contribution from any other person." The second statutory provision, section 78B-5-823, provides that the LRA does not "affect[] or impair[] any right to indemnity or contribution arising from statute, contract, or agreement." Suits for indemnity are different than suits for common law contribution because indemnity actions do not reallocate comparative fault. Thus, the LRA requires a single, unitary proceeding for allocating comparative fault but does not prohibit separate suits for indemnity.

¶ 62 Conflating implied indemnity with contribution caused the *Sanns* court to assume that an action for implied indemnity is a reallocation of fault—dividing damages between defendants. The *Sanns* court relied on an earlier court of appeals case that had concluded that implied indemnity and contribution are simply

---

[103] *Sanns*, 2004 UT App 203, ¶ 20 ("[I]t is clear that fault can no longer be apportioned to one defendant with the idea that it may later seek indemnification or contribution from another.").

[104] UTAH CODE § 78B-5-818(4)(a).

"alternative labels" for the same cause of action.[105] But our caselaw shows that we have maintained a clear distinction between these doctrines.

¶ 63 "'[I]ndemnity' involve[s] *full* reimbursement whereas 'contribution' involve[s] splitting the damages among the joint tortfeasors."[106] Contribution was the mechanism by which a defendant who paid an obligation for which he was only partially responsible under the doctrine of joint and several liability recovered the amount paid beyond his personal responsibility. This doctrine did reallocate fault between tortfeasors, each of whom was factually liable for only a portion of damages. Implied indemnity, on the other hand, has never applied to joint and several liability. Instead, it applied only to strict products liability claims[107] and principal/agent situations[108]—situations in which a defendant paid an obligation it was legally obligated to pay in full because of the defendant's relationship to a third party.[109] Contrary to the concurrence's suggestion,[110] an implied indemnity suit does not reallocate fault, for

---

[105] *Nat'l Serv. Indus., Inc. v. B.W. Norton Mfg. Co.*, 937 P.2d 551, 555 (Utah Ct. App. 1997).

[106] *Id.* at 554 (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 886B cmt. a (AM. LAW INST. 1979) ("A suit for indemnity is brought to recover the total amount of the payment by the plaintiff, on the ground that the plaintiff's conduct was not as blameworthy as the defendant's . . . .").

[107] *See, e.g., Davidson Lumber Sales, Inc. v. Bonneville Inc.*, 794 P.2d 11, 12 (Utah 1990).

[108] *See Culmer v. Wilson*, 44 P. 833, 836 (Utah 1896) (holding that the "law will imply an indemnity" to an agent who acts on the instructions of his principal "for any damages [the agent] was made to pay on account of such acts," if the agent acted in good faith and without wrongful intent or purpose).

[109] *See Hanover, Ltd. v. Cessna Aircraft Co.*, 758 P.2d 443, 446 (Utah Ct. App. 1988) (stating that an implied indemnity suit is "based upon the relationship between the parties" and implied indemnity prevents "the retailer-indemnitee . . . from being held derivatively or vicariously liable for the wrongful act of the manufacturer-indemnitor").

[110] The concurrence, like the *Sanns* court, conflates contribution and indemnity. The concurrence quotes *Black's Law Dictionary* for the definition of "contribution" that includes a "tortfeasor's right to

(Continued)

the paying party was legally responsible for the full amount of payment;[111] instead, indemnity is "granted in . . . factual situation[s] in which, as between the parties themselves, it is just and fair that the indemnitor should bear the *total responsibility*, rather than leave it on the indemnitee *or to divide it proportionately* between the parties by contribution.[112] In strict products liability actions, this means that "passive suppliers, distributors, and retailers may be entitled to indemnification from the manufacturer of a defective product for any judgment they are required to pay a purchaser."[113]

---

collect from joint tortfeasors when, and to the extent that, the tortfeasor has paid more than his or her proportionate share to the injured party, the shares being determined as percentages of causal fault." *Infra* ¶ 133 n.182. But this definition illustrates that contribution is distinct from indemnity, the latter of which does not involve an assessment of the "proportionate share" of "causal fault"; rather, indemnity operates independently of any allocation of causal fault. The relevant *Black's Law* definition of "indemnity" is "[t]he right of a party who is secondarily liable to recover from the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty." *Indemnity*, BLACK'S LAW DICTIONARY (10th ed. 2014). Black's Law also contains a definition of "implied indemnity," which specifically recognizes that this type of indemnity is "based on the parties' relationship." *Id.* These definitions highlight the distinction between indemnity and contribution. Indemnity involves one party's obligation to reimburse another based on the relationship between the parties, and not—as in the case of contribution—based on an allocation of fault.

[111] *See* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIAB. § 13 (AM. LAW INST. 2000) ("A person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other . . . .").

[112] RESTATEMENT (SECOND) OF TORTS § 886B cmt. c (AM. LAW INST. 1979) (emphases added).

[113] *Hanover*, 758 P.2d at 445–46. It bears repeating that, in a strict products liability action, each defendant who breaches the duty not to sell a defective product is strictly liable—its breach of this duty cannot be subdivided as a factual or legal matter, because there are no degrees of selling a product. *See supra* ¶ 58; *infra* ¶ 71. The basis for indemnification in this context then is not that a manufacturer is

(Continued)

¶ 64 The LRA specifically bars a defendant from recovering contribution, which is consistent with the fact that contribution was an artifact of the old comparative negligence regime where a party could bring a subsequent action seeking to allocate fault to another party. But indemnity is an altogether different matter. A right to implied indemnity exists independent of any assessment of fault, and is instead based on the relationship of the parties.[114] It therefore makes perfect sense that the LRA contains no provision barring an action for implied indemnity. The legislature decided to expressly prohibit contribution, and it could have done the same for indemnity, but it chose to foreclose only contribution. The fact that the legislature could have, but did not, foreclose indemnity is significant. Instead of assuming, as the concurrence does,[115] that the

responsible for some portion of the fault allocated to a distributor or retailer. Instead, the upstream parties' responsibility to indemnify those downstream arises from the nature of the relationship between the parties in the distribution chain, and not from an apportionment of fault.

[114] *See supra* ¶ 63 & n.109.

[115] The concurrence argues that the negative implication of Utah Code section 78B-5-823's preservation of rights to "indemnity or contribution arising from statute, contract, or agreement" is that indemnity rights arising from the common law are foreclosed. This argument is unpersuasive. The concurrence fails to recognize that the LRA expressly precludes only a right to contribution. *See* Utah Code § 78B-5-820(2) ("A defendant is not entitled to contribution from any other person.") Nothing in the statutory scheme expressly precludes a right of indemnity. Utah Code section 78B-5-823 buttresses this conclusion where it refers to "indemnity or contribution." The legislature's use of both terms in this section signals that it recognizes that the two terms refer to distinct legal doctrines and demonstrates that it knows how to refer to both when it so intends. *Id.* § 78B-5-823 ("Nothing in [the LRA] affects or impairs any right to indemnity or contribution arising from statute, contract, or agreement.") The concurrence concludes that the legislature, in using only the word "contribution" in section 820(2), intended to foreclose actions for both indemnity and contribution. But this conclusion violates well-recognized canons of statutory interpretation: "[w]e presume that the legislature used each word advisedly," *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (alteration in original) (citation omitted), and that a difference in word choice is to be assigned a difference in meaning, *see* 2A

(Continued)

legislature simply misspoke when it barred only contribution, but not indemnity, we presume that the omission of a prohibition against indemnity from the LRA was purposeful.[116] Giving effect to the statutory text, we recognize that the legislature is cognizant of the distinction between indemnity and contribution, and chose to foreclose only the latter. This choice is consistent with the legislative intent we have discussed above: to preserve strict products liability, not eliminate it. And the decision to omit a prohibition against indemnity is completely consistent with other provisions of the LRA because, as discussed above, indemnity does not involve a reallocation of fault.

¶ 65 Accordingly, the *Sanns* court's approach was fundamentally flawed. By conflating negligence with strict liability and contribution with implied indemnity, it in large measure reduced the "downstream" liability of non-manufacturers, effectively shielded retailers from liability, and flatly prohibited any "upstream" indemnity. As discussed above, the legislature intended to preserve our strict products liability doctrine as it was understood. The *Sanns* court did not. The passive retailer doctrine is inconsistent with the LRA's explicit retention of strict products liability.

¶ 66 In sum, the LRA does not immunize passive retailers from suit. Like every entity that breaches its duty not to sell a dangerously defective product, a passive retailer has "fault," as the LRA uses that term. This does not end our analysis, however, because we note the novel issue that is sure to be presented by this case on remand: whether a fact-finder can apportion fault among strictly liable defendants who are equally strictly liable under the same legal theory. We now turn to providing an answer to that question that

---

SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46:6 (7th ed.) ("Different words used in . . . a similar[] statute are assigned different meanings whenever possible."). Construing "contribution" to mean "contribution or indemnity," where the legislature elsewhere has referred to "indemnity or contribution," violates these canons. So there is little support for the argument that the LRA "appears to eliminate common law claims for both 'contribution' and 'indemnity.'" *Infra* ¶ 133 n.182. Rather, for the reasons we discuss, the most natural reading of these two provisions is that the LRA forecloses only contribution and not indemnity.

[116] *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984 (We "seek to give effect to omissions in statutory language by presuming all omissions to be purposeful." (citation omitted)).

honors and retains the essential aspects of our strict products liability doctrine.

*D. The LRA Does Not Require that Fault Be Allocated Among Strictly Liable Defendants; Instead, It Requires They Be Treated as a Single Unit Vis-à-Vis the Plaintiff*

¶ 67 On remand, the district court will confront a novel question that has not been addressed by appellate courts in Utah: how to handle the apportionment required by the LRA while honoring the legislature's intent to preserve our strict products liability doctrine. We provide guidance to the district court on remand so that it might avoid an improper application of the LRA's text in this context. As discussed above, the history of our strict products liability doctrine and the text and context of the LRA indicate that the legislature intended to preserve strict liability in enacting the LRA. Having demonstrated the legislature's intent to retain strict liability, we now explain how to achieve the legislative mandate that "fault" be apportioned in cases where multiple defendants are liable on the same strict liability theory. We reject an interpretation of the LRA that would require the fact-finder to allocate fault *among* strictly liable tortfeasors who are strictly liable under the same theory for the same harm. Such an approach would eviscerate our strict products liability doctrine by returning to concepts of negligence in determining which one of multiple strictly liable tortfeasors is at "fault" for the injury. But we must explain how, then, a fact-finder is to apportion "fault" when that term includes strict liability, products liability, and breach of warranty. We reconcile this language by adopting a "relative causation" approach applied by our sister courts in similar circumstances. This allows us to do justice to the LRA's text without eviscerating strict products liability doctrine's core tenets.

¶ 68 With these principles in mind, we begin with our conclusion, discussed above, that the legislature did not intend to abrogate the fundamental, substantive aspects of products liability. This conclusion requires that we address what the legislature did intend by including strict products liability within the scope of the LRA. Thus, although it is clear the LRA's allocation of "fault" cannot be based on culpability, there must still be some allocation of "fault" that includes strict products liability.

¶ 69 Accordingly, we have an ambiguity in the statute: it calls for apportionment of "fault" to each defendant, yet it does not alter the basic premise that the liability involved is strict liability—liability without fault. And there is no conceptual way of dividing strict liability—something that by definition cannot be divided—that does

not involve transforming it into a form of negligence. In resolving this ambiguity, the text of the LRA guides our approach.

¶ 70 The LRA requires the fact-finder to "allocate the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person identified . . . for whom there is a factual and legal basis to allocate fault."[117] Because any division of fault between strictly liable parties is either completely arbitrary or incorporates notions of negligence—neither of which is acceptable as a matter of legislative intent or under basic principles of law—there is simply no "factual or legal basis to allocate fault" between strictly liable parties who are liable under the same theory and for the same conduct.[118]

¶ 71 There is no factual basis to apportion strict products liability among strictly liable defendants because doing so requires the fact-finder to look for evidence of culpability, which is impermissible under a strict liability claim. The only "fault" at issue in strict products liability cases is the breach of the duty not to sell a defective product. Such "fault" is not based in notions of culpability or wrongdoing and is equally attributable to each seller of a product— from a manufacturer to a local retailer. There is also no legal basis to apportion strict products liability, for strict products liability is a binary question—did a party sell a defective product? If yes, then it is strictly liable. There is no legal principle found in our strict products liability doctrine that permits strict liability "fault" to be divided among multiple parties who are each liable for the same act.[119] Instead, the LRA requires us to apply comparative fault

---

[117] UTAH CODE § 78B-5-818(4)(a).

[118] *Id.* Although as a grammatical matter the statutory phrase "for whom there is a legal and factual basis to allocate fault" applies only to phrase "any other person identified"—non-parties to whom fault will be allocated—as a legal matter, fault can never be allocated to a party without a factual and legal basis for that allocation.

[119] We need not, and do not, decide here whether the LRA requires apportionment of damages among strictly liable defendants in contexts other than products liability. Other situations may arise, as the concurrence points out, where multiple defendants are each strictly liable for the same harm. *See infra* ¶ 124 n.173 (discussing *Red Flame Inc. v. Martinez*, 2000 UT 22, 996 P.2d 540). The concurrence relies on *Red Flame* for the proposition that we "implicitly accepted

(Continued)

principles based on the "relative responsibility" of each party by comparing "relative fault and relative causation."[120]

¶ 72 "Fault" under the LRA incorporates almost every claim that can "proximately caus[e] or contribut[e] to injury or damages."[121] Thus, the LRA's definition of fault expressly asks a fact-finder to look to "relative causation" in making its allocation of "fault." We recently reaffirmed this interpretation of the LRA in *Graves v. North Eastern Services, Inc.*[122] In that case, we reemphasized that LRA "shifted the focus *from apportionment of comparative negligence* to the task of 'assigning the relative responsibility' based on 'relative fault and relative causation.'"[123] The LRA did not redefine strict products liability into a negligence-based tort. Instead, the text makes clear that the LRA was intended to ensure that comparative fault principles would apply when comparing the strict liability of

---

the argument that comparative fault principles would apply even among strictly liable defendants." The concurrence correctly notes that the lead opinion in that case "repudiated a decision that had previously held that comparative fault principles did not apply between two establishments serving alcohol under the Dramshop Act." *Infra* ¶ 124 n.173. But that sheds no light on the problem we face here—how to interpret the LRA's interaction with strict *products* liability, which the legislature expressly sought to retain. Because *Red Flame* did not assess strict products liability under the LRA, it does not control our decision here. As we have explained, in a claim for strict products liability, the various entities in the chain of distribution have sold the *same* dangerously defective product to the same plaintiff, and there is thus no factual or legal basis to apportion fault between these entities. Whether the same holds true in other strict liability contexts is a question we need not decide here.

[120] *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301, 1304 (Utah 1981).

[121] UTAH CODE § 78B-5-817(2) (stating that "'[f]ault' means any actionable breach of legal duty, act, or omission," and includes "negligence in all its degrees, comparative negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability, and misuse, modification, or abuse of a product").

[122] 2015 UT 28, 345 P.3d 619.

[123] *Id.* ¶ 62 (emphasis added) (citation omitted).

defendants against the negligence of plaintiffs.[124] This is why the LRA includes within its definition of "fault" both the claims a plaintiff can assert—strict liability, products liability, and breach of warranty—as well as the defenses a strictly liable defendant can raise—misuse, modification, or abuse of a product.[125] These can and should be compared when determining a plaintiff's recovery. But the LRA was never intended to accomplish a legal impossibility—the allocation and division of strict products liability between multiple parties who are each strictly liable under the same theory for engaging in the same conduct. Instead, we must apply principles of relative causation in allocating "fault" among such parties. This approach is confirmed by the relevant legislative history and our own caselaw on this point.[126]

---

[124] Indeed, this is exactly what we have done in prior cases applying the LRA to strict liability claims. *See Red Flame*, 2000 UT 22, ¶¶ 2, 10–12 (applying comparative fault principles to compare the strict liability of a dramshop against the negligence of another defendant); *S.H. ex rel. Robinson v. Bistryski*, 923 P.2d 1376, 1380–82 (Utah 1996) (applying comparative fault principles to compare the strict liability of a dog owner for a dog bite to the negligence of a plaintiff).

[125] This conclusion is supported by the Product Liability Act. The PLA specifically states that "fault" for purposes of the LRA "shall include an alteration or modification of the product." UTAH CODE § 78B-6-705. Because the PLA is entirely focused on products liability, this suggests that the legislature's concern was comparing the fault of a negligent plaintiff against the strict liability of any seller.

[126] *See World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994) (holding that when the plain language of a statute is ambiguous and fails to resolve an issue, "we seek guidance from the legislative history and relevant policy considerations"). The concurrence argues that our reliance on legislative history is improper. *Infra* ¶ 105. We agree with the concurrence that "when statutory language is plain" there is no need to delve into legislative history. *Infra* ¶ 105. But we disagree that the LRA is as "plain" as the concurrence finds it. As we have noted, the text of the LRA leaves us with an ambiguity, *see supra* ¶ 69, and we accordingly look to legislative history as a valuable tool for gaining insight into resolving

(Continued)

¶ 73 When we adopted the products liability doctrine in 1979 in *Ernest W. Hahn, Inc. v. Armco Steel Co.*,[127] we held that there were two defenses to a strict products liability claim: misuse of the product and knowledge of the defect.[128] We specifically declined to address, however, "whether comparative principles should apply in strict products liability cases."[129] That issue was taken up in *Mulherin v. Ingersoll-Rand Co.*[130]

¶ 74 The jury in *Mulherin* had found that there were "concurrent proximate causes of the injury: the defective condition of the [product] manufactured by defendant and plaintiff's misuse of the [product]."[131] We stated that "[b]oth parties can therefore be said to be at fault in contributing to plaintiff's injuries," and held that "fault" in this context "connotes responsibility," not negligence.[132] We ultimately held that "both faults should be considered by the trier of fact in determining the relative burden each should bear for the injury they have caused."[133] In so doing, we noted that "[t]here may be semantic difficulties in comparing strict liability and negligence," but stated "that judges and juries will have no difficulty assigning the *relative responsibility* each is to bear for a particular injury" for "the ultimate issues in such comparisons are *relative fault and relative causation*."[134]

¶ 75 Soon after *Mulherin* was decided, the legislature adopted the LRA. The legislative history surrounding the LRA's adoption is clear that it was never intended to subvert or alter the substantive law of strict products liability. Senator Lyle Hillyard specifically asked about the inclusion of strict products liability within the LRA's definition of fault. He was concerned because, consonant with the longstanding understanding of strict liability described above, "if

---

that ambiguity in a way that best represents the expressed intent of the legislature.

[127] 601 P.2d 152, 156 (Utah 1979).

[128] *See id.* at 158.

[129] *Id.* at 158–59 (footnote omitted).

[130] 628 P.2d 1301 (Utah 1981).

[131] *Id.* at 1303.

[132] *Id.* at 1303 & n.7.

[133] *Id.* at 1303.

[134] *Id.* at 1304 (emphases added).

there's strict liability found, it's generally found, period, and you're not 10 percent or 20 percent or 50 percent at fault. . . . You're not even talking about percent, of 10 percent, 20 percent, or 50 percent. You're talking about totally different concepts."[135] Senator Hillyard was concerned that we had already begun to undercut our strict products liability doctrine in *Mulherin* by allowing the negligence of a party to be compared against the strict liability of another party.[136] He was further concerned that the legislature was conflating negligence with strict liability by way of the LRA's broad definition of "fault."

¶ 76 Assistant Attorney General Steve Sorenson's response to this concern was that the bill was not going to "change the substantive law of strict liability or breach of warranty at all."[137] Instead, "[w]hat it says is, if you have multiple defendants, *one of whom is guilty of negligence, one of whom is guilty of strict liability*, the jury, in apportioning fault, apportions fault between those parties regardless of the theory on which the party is liable."[138] In explaining the bill's effect, Mr. Sorenson stated that this issue—the comparing of "fault" between a party liable under negligence and a party liable under strict liability—was an issue that we as a court had struggled with in our decision in *Mulherin*.[139] The LRA was intended as a "clarification" that our decision in *Mulherin* was correct—that we can and should compare the "fault" of "different defendants, guilty on *different theories of liability*."[140]

¶ 77 Thus, the legislative history of the LRA confirms two conclusions that are clear from the text of the Act: first, the LRA did not "change the substantive law of strict liability or breach of

---

[135] Utah Senate Floor Debates, S.B. 64, 46th Leg., 1986 Gen. Sess. (Feb. 12, 1986) [hereinafter Debate] (statement of Sen. Lyle Hillyard).

[136] *See id.* (stating that absolute strict liability has "been clouded by the recent Supreme Court decision [*Mulherin*] on what damages you may recover").

[137] *Id.* at 18 (statement of Assistant Attorney General Steve Sorenson).

[138] *Id.* at 18–19 (emphasis added).

[139] *Id.* at 19.

[140] *Id.* (emphasis added).

warranty at all."[141] This intent was made evident through the legislature's specific preservation of products liability, as discussed above. At that time, the substantive law of strict products liability was (and still remains) that the doctrine "imposes liability in tort *without proof of negligence* upon 'one who sells any product in a defective condition unreasonably dangerous to the user or consumer.'"[142] Thus, whatever allocation is required under the LRA, it must leave intact the substantive law of strict products liability.

¶ 78 Second, the LRA codified the principles found in *Mulherin*—that we can compare the "fault" of a strictly liable party against the "fault" of a negligent one.[143] In fact, we expressly held that such was the case in *Graves v. North Eastern Services, Inc.*, where we recognized that "[t]he 1986 Act [the LRA] adopted the essential principles of the *Mulherin* court's analysis. . . . [I]t shifted the focus from apportionment of comparative negligence to the task of 'assigning the relative responsibility' based on 'relative fault and relative causation.'"[144] Thus, we can and must compare the relative causation of strictly liable parties against the relative fault of the plaintiff or other defendants.

¶ 79 Indeed, the only way to preserve both the substantive law of strict products liability—a doctrine distinct from negligence—as well as its policies and purposes—to protect and fully compensate injured plaintiffs—is to limit the LRA's apportionment of fault in strict products liability cases to the scenarios contemplated by the legislature when the LRA was enacted. As discussed above, the legislature was concerned with comparing the "fault" of strictly liable parties (the breach of the duty not to sell a defective product) against the negligence of others, usually the plaintiff.[145] We cannot,

---

[141] *Id.* at 18.

[142] *Mulherin*, 628 P.2d at 1302 (emphasis added) (citation omitted).

[143] *See* Debate, at 18–19 ("What it says is, if you have multiple defendants, *one of whom is guilty of negligence, one of whom is guilty of strict liability*, the jury, in apportioning fault, apportions fault between those two parties regardless of the theory on which the party is liable." (emphasis added) (statement of Assistant Attorney General Steve Sorenson)).

[144] *Graves*, 2015 UT 28, ¶ 62 (citation omitted).

[145] *See* Debate, at 19 (stating that the LRA requires a comparison of fault between "different defendants, guilty on *different theories of*

(Continued)

consonant with the text and history of the LRA as well as the doctrine and purposes of strict products liability, interpret the LRA to require the fact-finder to apportion fault among strictly liable parties. Indeed, we cannot divide strict products liability between strictly liable sellers of a defective product at all.

¶ 80 To reconcile the text of the LRA requiring apportionment with its explicit retention of strict products liability, we adopt the same approach that the Texas Supreme Court adopted in *Duncan v. Cessna Aircraft Co.*:

> Many courts and commentators have labeled this type of loss allocation system comparative *fault*. We choose comparative *causation* instead because it is conceptually accurate in cases based on strict liability and breach of warranty theories in which the defendant's "fault," in the traditional sense of culpability, is not at issue. The trier of fact is to *compare the harm caused by the defective product with the harm caused by the negligence of the other defendants, any settling tortfeasors and the plaintiff*. The fault or conduct of the products defendant is not at issue.[146]

¶ 81 Under this approach, the jury must make two determinations in resolving a strict products liability claim: first, the jury must determine whether the defendants are at "fault" — whether they breached their duty not to sell a defective product — and should be held strictly liable. In other words, the jury must first determine that the plaintiff has proven the elements of strict products liability — the product was defective, it caused some part of the plaintiff's

---

*liability*." (emphasis added) (statement of Assistant Attorney General Steve Sorenson)).

[146] 665 S.W.2d 414, 427 (Tex. 1984) (last emphasis added) (footnote omitted). Although the Texas court's approach was not based on a statute similar to the LRA, this does not change the persuasive authority of its approach. The court was "fashioning a common law comparative apportionment system for strict products liability cases" in recognition of "the impact of major legislative innovations" such as the adoption of a comparative negligence statute. *Id.* (citation omitted). Thus, the Texas court was applying the principles of a statutorily mandated comparative negligence analysis to strict products liability — the exact thing that the legislature has required that we do under the LRA.

injuries, it was sold by the defendant, and the defendant is in the business of selling such products. Then, after it has made that determination, the jury must allocate the "fault" in the case by determining the proportion of the injury caused by the defective product and the proportion of the injury caused by the plaintiff's "misuse, modification, or abuse of [the] product."[147] In this way, we honor the LRA's requirement to allocate "relative fault and relative causation."[148] Importantly, there is no separate comparison or allocation of strict liability "fault" as between the identically strictly liable defendants. The relative culpability of the defendants does not factor into the jury's allocation at all.

¶ 82 Once the jury has performed this allocation, whichever party is present in the suit that has been found to be strictly liable for selling the defective product must pay an amount equal to the proportion of the injury found to be caused by the defective product—in other words, the proportion of the injury caused by the strictly liable defendants' collective breach of their duty not to sell a defective product.[149] That party would then have the right to assert

---

[147] UTAH CODE § 78B-5-817(2). The usual products liability case will compare the causation of the plaintiff's actions against the defective product. This does not mean that there cannot be cases where the strict liability of a seller of a product must be compared with the negligence of a third-party or even its own negligence. Such a case may be where a seller of a product also installs the product in the plaintiff's home, permitting the plaintiff to assert both a strict products liability claim—the product was defective when sold—and a negligence claim—the product was negligently installed. The same type of analysis would apply: the fact-finder must first determine whether the parties breached their legal duties—whether the seller breached its duty not to sell a defective product and whether it also breached its separate duty of due care—and is thus responsible for the injuries under the asserted causes of action. Then the fact-finder must apportion the amount of injury that was caused by each breach. The seller would have an implied indemnity claim for the amount that it paid under the strict products liability claim.

[148] *Graves*, 2015 UT 28, ¶ 62 (citation omitted).

[149] *See* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIAB., § 7, cmt. j (AM. LAW INST. 2000) ("When a party is liable solely on the basis of another person's tortious conduct, there is no direct responsibility to assign to the party to whom liability is imputed. In that situation, the party who committed the tortious acts or

(Continued)

an indemnification claim against the manufacturer or other entities responsible for the defect in the product either as a cross-claim or a third-party claim in the original action or, if it so elects, in a separate proceeding altogether. And if there are multiple strictly liable parties, the plaintiff can recover from any of them, leaving the ultimate burden of payment to be fought out between the retailers, wholesalers, and manufacturer.

¶ 83 Under this approach, the principles of both the LRA and strict products liability are satisfied. No party has been required to pay more than its share of fault (the breach of the duty not to sell a defective product)—there is no return of joint and several liability—for, as discussed above, each party within a product's chain of distribution is fully liable for any injuries resulting from the product.[150] "Plaintiffs will continue to be relieved of proving that the manufacturer or distributor was negligent in the production, design, or dissemination of the article in question. Defendant's liability for injuries caused by a defective product remains strict. As a result, the

omissions and the party to whom liability is imputed are treated as a single unit for the assignment of responsibility. For example, an employer who is vicariously liable for the negligence of an employee and the employee are treated as a single entity. Similarly, *an innocent retailer and a manufacturer of a defective product are treated as a single entity*." (emphasis added)). Because the various entities in the supply chain will be treated as a single unit for purposes of fault allocation, the concurrence is incorrect to suggest that "cumulative fault will necessarily exceed 100 percent." *Infra* ¶ 114. The concurrence is also wrong to suggest that "every seller in the supply chain will be 100 percent liable." *Infra* ¶ 114. That statement fails to account for the apportionment of fault between the chain of distribution, as a unit, and others for whom there is a factual and legal basis to apportion fault, for example, the injured plaintiff and others who may have had a hand in bringing about the injury.

[150] *See* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIAB. § 13 (AM. LAW INST. 2000) ("A person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other . . . ."); *id.* § 13 cmt. a ("In a number of contexts, the responsibility of one actor is legally imputed to another, and vicarious liability is imposed. . . . Retailers and other nonmanufacturer sellers of products may be held strictly liable for a defect attributable to the manufacturer, in effect imposing vicarious liability on the retailer.").

product supplier's incentive to eliminate or to reduce product hazards should remain intact."[151] And "[c]omparative causation does not affect the right of a retailer or other member of the marketing chain to receive indemnity from the manufacturer of the defective product when the retailer or other member of the marketing chain is merely a conduit for the defective product and is not independently culpable."[152] By focusing on relative causation, we avoid conflating principles of negligence with strict liability. And products liability—with all of its attendant policies and purposes—survives intact, as intended by the legislature.

## II. We Vacate the District Court's Decision Declining to Award the Bylsmas Attorney Fees

¶ 84 The Bylsmas' request for attorney fees is based on a provision in a sales agreement with R.C. Willey and the terms of Utah Code section 78B-5-826. The security agreement provides that R.C. Willey is entitled to recover attorney fees if it is "required to instigate legal action or take other means to collect amounts" owed to it. This action was, of course, not initiated by R.C. Willey, but by the Bylsmas. But the Bylsmas nonetheless claim a right to recover fees under the agreement through the reciprocal attorney fee provision of the Utah Code. That provision states that a court may award attorney fees to "either party that prevails in a civil action based upon" a written contract if the terms of the agreement "allow at least one party to recover attorney fees."[153]

¶ 85 "This provision consists of a conditional if/then statement: (a) If the provisions of a written contract allow at least one party to recover attorney fees in a civil action based upon the contract, (b) then a court may award attorney fees to either party that prevails."[154] We have interpreted the statute to call for a hypothetical analysis of the case as it would have proceeded if successfully advanced by the party with an explicit right to fees under the contract.[155] If a contract would have allowed "one party to recover fees" in the "hypothetical" circumstance in which that party sued successfully

---

[151] *Duncan*, 665 S.W.2d at 428 (citations omitted).

[152] *Id.* at 432.

[153] UTAH CODE § 78B-5-826.

[154] *Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 12, 285 P.3d 766.

[155] *See id.* ¶ 29.

under its terms, then the statute dictates the other party's right to request a fee award when it sues and succeeds.[156]

¶ 86 The district court concluded that it had the discretion to award fees to the Bylsmas under this standard. But it ultimately declined to exercise that discretion because it found that the Bylsmas were not, on balance, a prevailing party. In reaching that conclusion the district court weighed the claim on which the Bylsmas had prevailed (the rescission claim) against those on which they had not (the product liability and warranty claims). Because the court deemed the latter claims more substantial, it found that the Bylsmas could not be viewed as "prevailing" in this action. And it declined to award fees on that basis.

¶ 87 A key premise of the district court's analysis is undermined by our reversal of the decision dismissing the Bylsmas' claims against R.C. Willey. Because R.C. Willey can no longer be thought of as a prevailing party on the product liability and warranty claims, there is no longer a basis for the decision to deny the Bylsmas their fees even on the face of the district court's opinion. That is enough to sustain a decision vacating the district court's analysis of the attorney fee issue, and we do so.

¶ 88 But we also acknowledge that the questions presented on the Bylsmas' request for attorney fees could arise in further proceedings on remand. And so we identify some further grounds for disagreement with the district court's decision.

¶ 89 As a threshold matter, we agree with the district court's determination that it had discretion to award the Bylsmas their fees under Utah Code section 78B-5-826. We reach that conclusion by applying the standard set forth in our *Hooban v. Unicity International, Inc.* decision. Under *Hooban* the question is whether the sales agreement would have allowed R.C. Willey to prevail in the "hypothetical" circumstance in which it sued successfully under its terms.[157] If so, the statute dictates the Bylsmas' right to request fees when they sue and succeed.[158] In this case R.C. Willey's hypothetical suit is one seeking collection from the Bylsmas. That is the logical counterpart to a suit by the Bylsmas asserting that they had no obligation to pay under a contract they sought to rescind. And

---

[156] *Id.*

[157] 2012 UT 40, ¶ 29.

[158] *Id.*

because R.C. Willey would have been entitled to fees if it had prevailed in a collection action, the Bylsmas have a statutory right to seek fees under Utah Code section 78B-5-826 because they succeeded on their claim for rescission.

¶ 90 The district court correctly reached this threshold conclusion. But it nonetheless declined to exercise its discretion to award fees on the basis of its determination that the Bylsmas were not, on balance, the prevailing party in this litigation. That analysis would make sense in the classic case in which the basis for a fee award—a statute or a contract—encompasses all of the various claims at issue in the case.[159] In that kind of case the court is necessarily required to make a global, net assessment of which party ultimately prevailed. And in so doing the court would consider, as the district court did here, the range of factors identified in our cases.[160]

¶ 91 But this case is different. Here the court was not confronted with a litany of claims all covered by the same fee-shifting provision. It was faced with a single claim covered by a single fee-shifting

---

[159] *See, e.g.*, *A.K. & R. Whipple Plumbing & Heating v. Guy*, 2004 UT 47, ¶¶ 31–32, 94 P.3d 270 (affirming a district court determination that neither party prevailed, under a statute allowing for attorney fees in actions to enforce a lien, when one party prevailed on its lien claims and the other party successfully recovered a substantial offset for negligent work).

[160] *See R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119 (identifying factors of relevance to the determination of which party prevailed). A similar analysis would apply to the determination of which party prevailed for purposes of awarding costs under rule 54(d) of the Utah Rules of Civil Procedure. Because that provision applies globally to an entire suit and not to individual claims, it calls for the court to make an overarching assessment of which party came out on top in the overall litigation. *See* UTAH R. CIV. P. 54(d) (providing for an award of costs to the "prevailing party" in the litigation). And in making that determination the court would consider, as the district court did here, the factors set forth in *R.T. Nielson Co.*, 2002 UT 11, ¶ 25. For that reason we find no error in the district court's assessment of costs in this case under rule 54(d). But we nonetheless reverse its decision as premature in light of our reversal of the dismissal of the Bylsmas' product liability and warranty claims.

clause. Only the rescission claim is even arguably subject to fee-shifting; the product liability and warranty claims are subject to the usual "American rule" requiring each side to pay its own fees. So in this case the only question for fee-shifting purposes is whether the Byslmas were entitled to a fee award as the prevailing party on the rescission claim under Utah Code section 78B-5-826. For reasons noted above, the Bylsmas qualified as a prevailing party under the statute. And so they should have been eligible for a fee award regardless of whether they lost or won on their other claims.

¶ 92 In these circumstances, it was error for the district court to consider claims not covered by Utah Code section 78B-5-826 in deciding whether the Bylsmas prevailed on their rescission claim. Those other claims are beside the point under a statute entitling the Bylsmas to recover the fees incurred in advancing their rescission claim. Where the Bylsmas prevailed on their rescission claim and have a statutory right to recover fees incurred in pursuit of that claim, it matters not whether they prevailed on other claims not subject to fee-shifting.

¶ 93 Where one claim is covered by a fee-shifting provision and others are not, the court's role is simply to parse the fees incurred on the covered claim from fees incurred on claims not subject to fee-shifting.[161] Once the covered fees are parsed out, the court should award all reasonable fees to the party entitled to recover them. It should not deny them outright on the ground that the prevailing party lost on other claims.

## Conclusion

¶ 94 "The public interest in human life, health and safety demands the maximum possible protection that the law can give against dangerous defects in products which consumers must buy, and against which they are helpless to protect themselves; and it justifies the imposition, upon all suppliers of such products, of full responsibility for the harm they cause, even though the supplier has not been negligent."[162] This is the reason why this court, thirty-seven

---

[161] *See Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 36, 94 P.3d 193 (requiring prevailing party to "apportion or separate out the recoverable fees from the nonrecoverable ones").

[162] William L. Prosser, *The Assault upon the Citadel (Strict Liability to the Consumer)*, 69 YALE L.J. 1099, 1122 (1960).

years ago, adopted the doctrine of products liability. We retain this doctrine, as the legislature specifically required in the LRA, and specify the proper method for allocation of fault under that act. Our decision today retains the doctrine's essential elements—liability without fault, imposed equally on any entity that sells a defective product, with recourse for non-negligent sellers to claim indemnity. In the context of strict products liability, the LRA requires allocation of fault based on relative causation, not culpability. This type of allocation honors the legislature's retention of strict products liability in the act.

¶ 95 Accordingly, we reverse the dismissal of the Bylsmas' product liability and warranty claims and remand for further proceedings consistent with this opinion. We also clarify the standards that apply to a fee request like that submitted by the Bylsmas.

---

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶ 96 In this case we consider the effect of the Liability Reform Act (LRA), UTAH CODE §§ 78B-5-817 through 823, on the law of strict products liability. A key question presented is whether the act confers immunity from liability on a "passive retailer" of merchandise manufactured by others. The majority answers that question in the negative. *See supra* ¶ 2. It abrogates the so-called "passive retailer" doctrine adopted by the court of appeals in *Sanns v. Butterfield Ford*, 2004 UT App 203, 94 P.3d 301. And it reverses the district court's decision granting defendant R.C. Willey's motion to dismiss the tort and warranty claims at issue here under the authority of that doctrine.

¶ 97 I agree with this much of the majority's analysis. I concur in the decision to overrule the passive retailer doctrine adopted in *Sanns*, as I find it incompatible with the governing terms of the LRA. And I likewise concur in the court's decision to award the plaintiffs their attorney fees on their claim for rescission. *See supra* ¶¶ 84–93.

¶ 98 I write separately, however, because I cannot agree with the standards for apportionment of fault announced by the majority today. I find no room in the LRA, for example, for the notion of a strict products liability scheme in which "each seller of a defective product [is] equally and strictly liable," *supra* ¶ 28, and in which "an 'innocent' non-manufacturer" may "recover its losses from the manufacturer by way of indemnity," *supra* ¶ 23. Admittedly, those

Lee, A.C.J., concurring in part and concurring in the judgment

are tenets of the common law doctrine of strict products liability. But in Utah that scheme has been altered by the LRA—by the statute's requirement of apportionment of "fault," which encompasses not just "any actionable breach of legal duty" but also "products liability," "strict liability," and "breach of express or implied warranty of a product." UTAH CODE § 78B-5-817(2).

¶ 99 I find these and other key provisions of the LRA to override the principles of products liability set forth in the majority opinion. Thus, I would reject the passive retailer doctrine without embracing the principles of joint and several liability set forth by the court. Instead I would give effect to the LRA as written—in a manner requiring apportionment of strict products liability "fault" for any and all parties available for apportionment under the statute, resulting in a judgment foreclosing separate claims for indemnity.

¶ 100 The standards set forth in the majority opinion may well align with sound policy in this important field. I can also see valid policy grounds for a doctrine of immunity for merely "passive" retailers like R.C. Willey. But here we have no license to make good policy. The legislature has announced the governing policy for tort cases like this one in the clear terms of the LRA. And we are bound to implement those terms. Any bid for amendment of those terms should be directed to the legislature.

I

¶ 101 The LRA seems to me to foreclose the joint and several liability scheme adopted by the majority. It does so, in my view, by providing that "the maximum amount for which a defendant may be liable to any person seeking recovery is that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant." UTAH CODE § 78B-5-820(1). And it reinforces that premise with the proviso that "[n]o defendant is liable to any person seeking recovery for any amount in excess of the proportion of fault attributed to that defendant." *Id.* § 78B-5-818(3).

¶ 102 The statutory mechanism for effecting these provisions is in the requirement of apportionment of comparative "fault." Under Utah Code section 78B-5-819(1), the factfinder is directed to "determin[e] the total amount of damages sustained and the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person identified under Subsection 78B-5-821(4) for whom

Lee, A.C.J., concurring in part and concurring in the judgment

there is a factual and legal basis to allocate fault."[163] That section further provides guidance on how to handle immune parties. *Id.* § 78B-5-819(2). And it expressly limits the "cumulative fault" of all parties and relevant nonparties to 100 percent. *Id.* Subsection 821(4), in turn, prescribes a procedure for identifying unnamed parties to whom fault may be allocated. It states that "[f]ault may not be allocated to a non-party unless a party timely files a description of the factual and legal basis on which fault can be allocated and information identifying the non-party, to the extent known or reasonably available to the party, including name, address, telephone number and employer." *Id.* § 78B-5-821(4).

¶ 103  The majority seeks to avoid the effect of these provisions by insisting that strict products liability does not implicate any degree of relative "fault." *Supra* ¶ 34. It notes that common law products liability was "strict," imposing joint and several liability on any seller in the supply chain of an unreasonably dangerous product, and thus protecting the interests of any who are injured by such product. *Supra* ¶ 33. And because the LRA incorporates terms of art from the law of products liability, the court concludes that the legislature intended to "preserve "the claims and defenses of products liability as they were understood" at the time the LRA was enacted. *Supra* ¶ 18; *see also supra* ¶ 15 (asserting that there are "key aspects of [the strict products liability] doctrine that must continue to exist if we are to honor the legislative intent to retain it").

¶ 104 The majority seeks to support these conclusions by invoking testimony presented by an assistant attorney general in the legislative proceedings leading to the enactment of the LRA. *See supra* ¶ 76 (citing Utah Senate Floor Debate, S.B. 64, 46th Leg., Gen.

---

[163] The majority insists that this provision can be read to treat "the supply chain" in a products liability case "as a single unit for purposes of fault allocation." *Supra* ¶ 82 n.149. But that construction is incompatible with the statutory text. The LRA requires that fault be attributed "to each defendant." UTAH CODE § 78B-5-819(1). And there are no exceptions to this mandate—certainly nothing that suggests that multiple defendants may be lumped together in certain circumstances (as where they are part of the same supply chain). Thus, the majority's approach reads "substantive terms into the text that are not already there"—an approach foreclosed by our canons of construction. *See Arredondo v. Avis Rent A Car Sys., Inc.*, 2001 UT 29, ¶ 12, 24 P.3d 928 (citation omitted).

Lee, A.C.J., concurring in part and concurring in the judgment

Sess., (Feb. 12, 1986)). It notes that Assistant Attorney General Steve Sorenson stated, during the floor debate, that the LRA would not "change the substantive law of strict liability." *Supra* ¶ 76. And from that statement the majority infers that "whatever allocation is required under the LRA, it must leave intact the substantive law of strict products liability." *Supra* ¶ 77.

¶ 105 I cannot endorse the majority's form of intentionalism.[164] This court has frequently stated that the statutory text is the first and

---

[164] I have elsewhere characterized my approach to statutory interpretation as rooted in "textualism" — in the notion that our role is not so much to read the legislature's mind in search of its "intent," but to find the meaning of the language it votes into law (the "text"). *State v. Rasabout*, 2015 UT 72, ¶ 124, 356 P.3d 1258 (Lee, A.C.J., concurring in part and concurring in the judgment) ("In my opinions on statutory interpretation, I tend to speak of our role in interpreting the text of the statute, as that is what was voted on and signed into law by the legislature and the governor. This is a basic premise of textualism."). Typically I have nonetheless joined opinions of my colleagues couching their statutory analysis in the language of intentionalism. I do so because I often find little or no difference between an *intentionalist* and a *textualist* approach to statutory interpretation. That holds true where the legislature's intent is derived from a careful construction of a statute's plain language, as is often the case. *See id.* A principal vice of intentionalism appears, however, when a court abandons that important premise. If a court finds legislative intent beyond the four corners of a statute it runs a big risk of substituting its own will for that of the legislature. *See State v. Clark*, 2011 UT 23, ¶ 17, 251 P.3d 829 ("Any suppositions about what the legislature may have intended cannot properly override what it actually did."); *see also* Laurence H. Tribe, *Comment, in* ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 66 (1997) ("[I]t is the *text's* meaning, and not the content of anyone's expectations or intentions, that binds us as law."); Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 69 (1994) ("Imaginative reconstruction, asking how an expired Congress would have answered a question had the subject been presented, extends the term beyond the constitutional limit — and is of course fantasy anyway, since we can imagine any answer we want when we are inventing both question and answer."). This is one of several reasons why I prefer to frame the judicial inquiry in textualist terms. This

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

best evidence of legislative intent. *See, e.g., Anderson v. Bell*, 2010 UT 47, ¶ 9, 234 P.3d 1147 (internal quotation marks omitted) ("It is axiomatic that the best evidence of legislative intent is the plain language of the statute itself.")); *Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1038 (Utah 1989) ("[T]he best indication of legislative intent is the statute's plain language."). Equally often we say that the text is controlling—and forecloses other sources of meaning—where it is clear or unambiguous. *See, e.g., St. Jeor v. Kerr Corp.*, 2015 UT 49, ¶ 12, 353 P.3d 137 ("[W]here the text of the rule is clear and unambiguous, our inquiry ends, and we need not resort to additional methods of interpretation."); *Allred v. Saunders*, 2014 UT 43, ¶ 18, 342 P.3d 204 ("Though it is sometimes appropriate to consider legislative history when interpreting statutes, we will not do so when a statute is . . . unambiguous."). That means that legislative history is out of bounds when statutory language is plain. *See Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 285 P.3d 766 ("Where the statute's language marks its reach in clear and unambiguous terms, it is our role to enforce a legislative purpose that matches those terms, not to supplant it with a narrower or broader one that we might infer from the legislative history.").[165]

---

case is a good example of why—and how the framing of the inquiry might make a difference. *See* John F. Manning, *What Divides Textualists from Purposivists?*, 106 COLUM. L. REV. 70, 73 (2006); Caleb Nelson, *What Is Textualism?*, 91 VA. L. REV. 347 (2005).

[165] Even if I found ambiguity in the text I still would not find room for resort to the sort of legislative history presented here. This really isn't even legislative history—in the sense of some material evidencing *legislators*' intentions. Here we have only an indication of the intentions of an attorney working for another branch of government. And we have every reason to be suspicious of the probative value of the statement in question. *See* Oral Argument (acknowledging that statements in legislative history were planted by interest groups seeking to prospectively sway future judicial interpretations of the LRA in their favor); John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 COLUM. L. REV. 673, 688 (1997) ("[T]o the degree that judges are perceived as grasping at any fragment of legislative history for insights into congressional intent, to that degree will legislators be encouraged to salt the legislative record with unilateral interpretations of statutory provisions they were unable to persuade their colleagues to accept."

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

¶ 106 And here, at least in my view, the LRA could hardly be plainer. The statute includes a broad notion of "fault." By statute "[f]ault" encompasses "any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery." Utah Code § 78B-5-817(2). And the statutory definition expressly encompasses not just "negligence in all its degrees" but also "products liability," "strict liability," and "breach of express or implied warranty of a product." *Id.* Under the LRA, then, the factfinder is required to apportion the relative "fault" of various sellers in the supply chain of an unreasonably dangerous product. *Id.* § 78B-5-819(1). Such apportionment must extend even to a nonparty (for whom there is a factual and legal basis to impose liability). *Id.* And the total "cumulative fault" for all sellers must not exceed 100 percent. *Id.* § 78B-5-819(2)(a).[166]

¶ 107 The LRA also forecloses equitable claims for contribution and indemnity. *See id.* § 78B-5-820(2) ("A defendant is not entitled to contribution from any other person."); *id.* § 78B-5-823 (preserving only indemnity and contribution "arising from statute, contract, or agreement"). Thus, the LRA envisions a single proceeding in which "fault" is apportioned among all parties and all others as to whom there is a factual and legal basis for apportionment. And the only way to accomplish that feat is to apportion relative fault among various sellers in the supply chain—as expressly required by statute.

¶ 108 This LRA notion of fault, concededly, is not in line with the common law conception of strict products liability. The majority has the common law doctrine of products liability exactly right. At common law, strict products liability "imposes liability for harm

---

(quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 717 (D.C. Cir. 1987) (Buckley, J., concurring))).

[166] The majority says that this approach "create[s] a more expansive form of retailer immunity." *Supra* ¶ 46. But the apportionment of fault among several defendants does not render any of them immune. Immunity is an "exemption from a duty, liability, or service of process." BLACK'S LAW DICTIONARY 817 (9th ed. 2009). And my approach does not exempt any strict liability defendants from any duty or liability. It simply limits the amount of damages they pay according to their portion of ultimate fault. The degree of any limit, moreover, is a function of the statutory mandate, which we are in no position to second-guess.

Lee, A.C.J., concurring in part and concurring in the judgment

caused by defective products without any regard to the culpability of the defendants." *Supra* ¶ 23. It "imposes this liability on every 'seller' of the product . . . in order to ensure that a plaintiff will have a meaningful remedy." *Supra* ¶ 23. And "it permits an 'innocent' non-manufacturer . . . to recover its losses from the manufacturer by way of indemnity." *Supra* ¶ 23.

¶ 109  But these are the principles of joint and several liability.[167] And they are not compatible with the clear language voted into law by our legislature. *See supra* ¶ 17 (conceding that "[t]he LRA was expressly designed to eliminate joint and several liability").

¶ 110  I concede that "there is no room" in the common law "strict liability regime for the consideration of culpability." *Supra* ¶ 26. But that is not the fault regime adopted by the legislature in the LRA. The LRA made "a choice between fully compensating the plaintiff and proportionally assessing damages to the defendant." *Red Flame, Inc., v. Martinez*, 2000 UT 22, ¶¶ 18, 20, 996 P.2d 540 (Durham, A.C.J., dissenting) (citation omitted) (refusing to extend the LRA to apportionment of strict liability under the Dramshop Liability Act, but asserting that "the penal and regulatory purposes of the Dramshop Act will be frustrated by permitting application of the comparative fault principles of the Liability Reform Act"). And we are in no position to second-guess that judgment. *See id.* ¶ 10 (lead opinion of Russon, J., joined by Zimmerman, J.) (concluding that the LRA requires apportionment of strict liability among parties liable under the Dramshop Liability Act); *id.* ¶ 14 (Howe, C.J., concurring) (concluding that the LRA overrides the Dramshop Act, abolishes joint and several liability, and requires apportionment; conceding that the legislature may not have "intended" that result, but finding himself "constrained by the language" of the LRA).

¶ 111  It may well be good policy to go a different route. If I were a member of the legislature I might well vote for an amendment to the LRA allowing a plaintiff to choose only one seller in the supply chain—perhaps most often the retailer—who is "known to the

---

[167] *See* BLACK'S LAW DICTIONARY 997 (9th ed. 2009) (defining "joint and several liability" as "[l]iability that may be apportioned either among two or more parties *or to only one or a few select members of the group, at the adversary's discretion*. Thus, each liable party is individually responsible for the entire obligation, but a paying party may have a right of contribution and indemnity from nonpaying parties." (emphasis added)).

Lee, A.C.J., concurring in part and concurring in the judgment

plaintiff, amenable to suit, and likely solvent at the time of judgment." *Supra* ¶ 28. And I might well prefer to leave it to a future indemnity lawsuit to allow the retailer to seek recourse against a manufacturer or other sellers in the supply chain. But I find no room for this regime in our statute.

¶ 112 The LRA provides no exception for the apportionment of fault in strict liability cases. It specifically lists strict liability and products liability as forms of "fault" that must be apportioned by the factfinder. UTAH CODE § 78B-5-817; *see also S.H. ex rel. Robinson v. Bistryski*, 923 P.2d 1376, 1380 (Utah 1996) ("By including 'strict liability' in the definition of fault, the legislature clearly intended comparative fault principles to be applied to strict liability claims . . . .").

¶ 113 Thus, I find no ambiguity in the LRA on the question whether to apportion fault among various sellers in the supply chain of an unreasonably dangerous product. And for that reason I find no room to insist that the legislature must have intended to preserve the common law regime embraced by the majority.

¶ 114 The majority's approach runs directly contrary to the statute. Under the majority's scheme cumulative fault will necessarily exceed 100 percent whenever there are multiple defendants who are strictly liable or whenever a lone strictly liable defendant properly brings nonparties within the allocation. In fact, each and every seller in the supply chain will be 100 percent liable. That means that relative fault may be multiples of 100 percent under the majority's framework. That is not the law enacted by the legislature. We should follow the terms of the LRA even if we find it difficult to do so, or troubling as a matter of wise policy. *See Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 70, 345 P.3d 619 ("In the face of a detailed statutory scheme like the Liability Reform Act, our role as policymaker is preempted. We are relegated to the function of agent of the legislature—of interpreting the policy judgment that it reached, and not of imposing our own will through the exercise of our limited judicial power.").

II

¶ 115 The above-cited provisions of the LRA provide a straightforward basis for rejecting the so-called passive retailer doctrine. That doctrine confers blanket immunity on a purely passive retailer in a suit in which the manufacturer is named as a party. *See Sanns v. Butterfield Ford*, 2004 UT App 203, ¶ 15, 94 P.3d 301 (limiting passive retailer immunity to cases in which the

Lee, A.C.J., concurring in part and concurring in the judgment

manufacturer is named as a party). But such immunity cannot stand under the terms of the LRA and the tenets of strict products liability embraced in our case law (and not foreclosed by this statute).

A

¶ 116 Under the LRA a passive retailer's comparative fault cannot turn on the presence of the manufacturer as a party to the suit. The factfinder's obligation to allocate comparative fault, as noted, extends not only to parties but also to identified non-parties "for whom there is a factual and legal basis to allocate fault." UTAH CODE § 78B-5-819(1). A manufacturer will always be one to whom there is a "factual and legal basis to allocate fault" under the law of strict products liability. So the manufacturer's presence as a party cannot be what triggers the premise of the passive retailer doctrine — that 100 percent of the fault will always be allocated to the manufacturer.

¶ 117 Such an allocation is available whether or not the manufacturer is named as a party. By statute, fault is allocated even to non-parties so long as they are identified under Utah Code section 78B-5-821(4).

¶ 118 So a key premise of the *Sanns* immunity doctrine fails as a matter of law. A passive retailer's immunity, if any, cannot depend on the presence of the manufacturer as a defendant in the suit. It must depend on the proposition that a passive retailer could never be deemed at fault to any degree in a case in which the manufacturer could be identified and considered by the factfinder.

B

¶ 119 The law of strict products liability is likewise incompatible with passive retailer immunity. Retailers — even passive ones — have duties to consumers that run independently of the duties of manufacturers.[168] That follows from a core premise of the law of

---

[168] *See Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1420 (5th Cir. 1986) (concluding that because "a product manufacturer and a [retailer] owe independent duties to warn consumers regarding a product 'defect,'" a retailer's failure to warn is not a defense to the manufacturer's failure to warn); RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 1 cmt. e (AM. LAW INST. 1998) ("Liability attaches even when such nonmanufacturing sellers or distributors do not themselves render the products defective and

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

strict products liability—that everyone in the supply chain is in a better position than the consumer to protect against and warn of the risks of unreasonably dangerous products.[169] And if even passive retailers have independent duties to consumers injured by unreasonably dangerous products, then it follows that they may retain some element of fault for the injuries incurred by their customers.[170]

¶ 120 This conclusion is reinforced by a line of cases in place at the time of the legislature's adoption of the LRA in 1986. In this line of cases, a number of courts held that the "dividing line" between "active" and "passive" tortious conduct in the law of implied indemnity had been "blurred" or erased by the advent of comparative fault. *See Pachowitz v. Milwaukee & Suburban Transp. Corp.*, 202 N.W.2d 268, 271–72 (Wis. 1972) (holding that the common law distinction had been replaced by comparative fault). In other words, these courts held that "the active-passive dichotomy of tort indemnity actions did not survive the statutory adoption of comparative negligence." *Ellis v. Union Pac. R.R. Co.*, 643 P.2d 158, 163 (Kan. 1982). And they repudiated the active-passive distinction in the law of implied indemnity in favor of a nuanced, case-by-case attribution of fault based on principles of comparative negligence.

¶ 121 This approach prevailed in a wide range of tort cases. Some of these cases involved strict products liability.[171] In this field

---

regardless of whether they are in a position to prevent defects from occurring.").

[169] *See O'Neil v. Crane Co.*, 266 P.3d 987, 999 (Cal. 2012) (noting that strict products liability extends to all entities in the chain of distribution who are "responsible for placing an injury-producing product into the stream of commerce" (citation omitted)); RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 1 cmt. e (AM. LAW INST. 1998) ("[A]ll commercial sellers and distributors of products, including nonmanufacturing sellers and distributors such as wholesalers and retailers, are subject to liability for selling products that are defective.").

[170] *See Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 673 (Utah 1985) (explaining that strict products liability is "premised on the proposition that the cost of injuries . . . should be considered a cost of doing business").

[171] *See, e.g.*, *Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362, 367–68 (Minn. 1977) (rejecting the traditional doctrine of "passive" or

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

the courts rejected the notion of a hard distinction between active and passive conduct as "artificial"—and as insufficiently nuanced to account for the nuance and complexity of products liability litigation. *Casey v. Westinghouse Elevator Co.*, 651 F. Supp. 258, 262 (S.D. Ill. 1986).

¶ 122 Yet the repudiation of the active-passive distinction in the law of implied indemnity was not limited to products liability suits. It extended to other circumstances involving a primary, "active" tortfeasor and a secondary tortfeasor with a duty to take action to avoid or mitigate the effects of the primary tortfeasor's acts. One example involves dangerous conditions on land. Under a common law regime of joint and several liability, the party maintaining the dangerous condition was deemed the "active" tortfeasor. *See Auto. Underwriters Corp. v. Harrelson*, 409 N.W.2d 688, 690–91 (Iowa 1987). A party with a duty to discover and remedy that condition was also liable as a "passive" tortfeasor. *Id.* But the "passively negligent" party had a right to "recover in full from one actively negligent any judgment or settlement paid by the passively negligent party based on principles of equity." *Id.* This regime was also deemed foreclosed by the advent of comparative negligence. *See Am. Tr. & Sav. Bank v. U.S. Fid. & Guar. Co.*, 439 N.W.2d 188, 190 (Iowa 1989). Courts held that "the doctrine of indemnity based upon active-passive negligence does not fit within [a] statutory network of comparative fault." *Id.* And they accordingly abandoned the black-and-white rule apportioning all fault to the active tortfeasor in a suit for implied indemnity, concluding instead that the law of comparative negligence required a nuanced apportionment of relative fault between both tortfeasors.[172]

---

"secondary" liability in the negligence, strict liability, and implied warranty contexts); *Mo. Pac. R.R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466, 470 (Mo. 1978) (concluding that it was illogical for a party with "passive" fault to be held harmless "no matter how great the proportion of fault may have been of the passive tortfeasor" and leaving allocation of fault to the jury).

[172] *See* VICTOR E. SCHWARTZ ET AL., PROSSER, WADE AND SCHWARTZ'S TORTS: CASES AND MATERIALS 387 (10th ed. 2000) (explaining that "[w]ith the development of comparative responsibility principles, this form of indemnity has been curtailed in many states"); *Pachowitz v. Milwaukee & Suburban Transp. Corp.*, 202 N.W.2d 268, 271–72 (Wis. 1972) (noting that "the dividing line" between passive and active liability "is blurred" and concluding that

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

¶ 123 Our legislature enacted the LRA against the backdrop of the above cases. And I would read the statute to effectively embrace the principle that these cases espouse. In my view the LRA does so by abandoning the premise of a hard distinction between active and passive tortfeasors and replacing it with a mechanism for a nuanced, case-by-case attribution of relative fault for anyone who causes or contributes to an injury by any "act," "omission," or "breach of legal duty." Utah Code § 78B-5-817(2).

¶ 124 We have effectively so concluded in a series of cases concerning allocation of fault in strict liability cases. In *S.H. ex rel. Robinson v. Bistryski*, 923 P.2d 1376, 1383 (Utah 1996), for example, we concluded that comparative fault principles should apply to [] strict liability under the LRA. And we found that a "plaintiff's recovery was subject to the application of comparative fault" and could be reduced due to the plaintiff's negligence. *Id.* at 1380. This was also the conclusion that we reached in *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301, 1303 (Utah 1981), as to products liability cases.[173]

---

only comparative fault principles could lead to "an equitable and fair result . . . . . in all cases" (citation omitted)); *Ellis v. Union Pac. R.R. Co.*, 643 P.2d 158, 163 (Kan. 1982) (emphasizing that "the active-passive dichotomy of tort indemnity actions did not survive the statutory adoption of comparative negligence"); *Am. Nat. Bank & Tr. Co. v. Columbus-Cuneo-Cabrini Med. Ctr.*, 609 N.E.2d 285, 288 (Ill. 1992) (concluding that in light of adoption of pure comparative negligence, the "reason to support implied indemnity based on tort principles of relative blameworthiness has ceased to exist").

[173] The majority correctly notes that these cases involved a comparison between the fault of a strictly liable defendant and a negligent plaintiff. *See supra* ¶ 72 & n.124. But we have strongly implied that these same principles would apply in determining fault among defendants. In *Red Flame, Inc. v. Martinez*, 2000 UT 22, 996 P.2d 540, we concluded that comparative fault principles applied when determining an establishment's fault for dispensing alcohol under the Dramshop Liability Act. And we expressly rejected the argument that "strict liability cannot be included in comparative fault calculations." 2000 UT 22, ¶ 11 (lead opinion Russon, J., joined by Zimmerman, J.); *see also id.* ¶ 14 (Howe, C.J., concurring) (concluding that the LRA overrides the Dramshop Act, abolishes joint and several liability, and requires apportionment). In so doing, we repudiated a decision that had previously held that comparative fault principles did not apply between two establishments serving

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

¶ 125 Our recent decision in *Graves v. North Eastern Services, Inc.*, 2015 UT 28, 345 P.3d 619, points in the same direction. In *Graves* we held that the LRA requirement of comparative allocation of fault extended to intentionally tortious acts. In so doing, we acknowledged the inherent difficulty of the factfinder's task of allocating relative fault to both a primary intentional tortfeasor and to a passively negligent one (an employer who failed to prevent the intentional tort). Specifically, we conceded that intentionally tortious conduct is "categorically different"—and inherently more blameworthy—than a negligent failure to prevent it. *Id.* ¶ 71 (citation omitted). Yet we also explained that a "factfinder could easily apportion" responsibility to passive acts of negligence representing a "clear chance of preventing" an intentional tort. *Id.* And we interpreted the LRA to leave to the factfinder the relative apportionment of fault between an active, intentional tortfeasor and a person who passively failed to prevent such misconduct despite the sensitive, nuanced nature of that task. *Id.*

¶ 126 This framework is incompatible with the theory that comparative fault applies only between plaintiffs and defendants in strict liability cases. A "passive" retailer is in a position comparable to that of the employer in *Graves*. Its role is "categorically different" from that of the antecedent actor whose act might be understood as more active. Yet our law still holds the passive actor liable for acts, omissions, or breaches of legal duty resulting in harm. And the LRA

---

alcohol under the Dramshop Act. Thus, we implicitly accepted the argument that comparative fault principles would apply even among strictly liable defendants.

The majority notes that *Red Flame* is not a "strict *products* liability" claim. *Supra* ¶ 71 n.119. And it accordingly contends that this case "does not control our decision here." *Supra* ¶ 71 n.119. But that is a distinction without a difference. I see no basis in the statutory text for treating strict liability cases any differently than products liability cases. The only reference to *products liability* in the statutory scheme is in the same provision that addresses *strict liability*. Both terms are included only in the definition of the term "fault," which is to be apportioned "to each defendant." *See* UTAH CODE § 78B-5-817(2); *id.* § 78B-5-819. *Red Flame* followed this mandate for strict liability fault. There is no reason not to follow the same statutory mandate for products liability fault here. *See supra* ¶ 102 n.163.

Lee, A.C.J., concurring in part and concurring in the judgment

leaves it to the factfinder to sort out the relative fault to be allocated to each party.

¶ 127 In cases both predating and postdating the LRA, retailers have at least sometimes been left with a portion of liability for harms caused by the dangerous products they sold—even in cases in which the manufacturer is also on the hook.[174] A straightforward example involves a breach by a retailer of the duty to warn: A factfinder could easily conclude that a retailer is in as good or better a position to warn a consumer of a product's risks than the manufacturer.[175] In

---

[174] *See Casey v. Westinghouse Elevator Co.*, 651 F. Supp. 258, 262 (S.D. Ill. 1986) (concluding that application of comparative fault principles between a manufacturer and a third party was "not contrary to the policies behind strict liability" (citation omitted)); *Promaulayko v. Johns Manville Sales Corp.*, 562 A.2d 202, 207 (N.J. 1989) (noting that "a set of facts might arise in which the party at the end of the distributive chain will be a better risk-bearer than a party higher in the chain"); *Durabla Mfg. Co. v. Goodyear Tire & Rubber Co.*, 992 F. Supp. 657, 660 (S.D.N.Y. 1998) (refusing to grant indemnity to the passive distributor of products made with asbestos because "there is nothing passive about the role of a distributor of a defective or hazardous product" and therefore the distributor may be held at fault); *Chandler v. Nw. Eng'g Co.*, 444 N.Y.S.2d 398, 404–05 (N.Y. Sup. Ct. 1981) (holding that it "cannot say that, as a matter of law" that a "jury erred in assessing" a seller's "liability at 10%" because the liability was based on the seller's "position in the chain of distribution" rather than purely based on its vicarious relationship with the manufacturer).

[175] *See House v. Armour of Am., Inc.*, 929 P.2d 340 (Utah 1996) (laying out the basic framework of failure to warn liability in Utah); *Grundberg v. Upjohn Co.*, 813 P.2d 89, 95 (Utah 1991) (holding that failure to warn claims were still viable against a drug manufacturer even where the manufacturer was "immune" from a design defect claim because drugs were "unavoidably dangerous" in design); *see also Beshada v. Johns-Manville Prods. Corp.*, 447 A.2d 539, 545 (N.J. 1982) (noting that strict liability failure to warn claims are based in the presumption that "a warning could make [a product] safer at virtually no added cost and without limiting its utility"); *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 419 (S.D.N.Y. 2011) (holding that "an injured plaintiff in a strict liability failure to warn case may recover from both manufacturers and retail sellers of the product"); *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 309 (N.Y. 1998)

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

that event the passive retailer could be on the hook for at least some proportion of fault in a products liability action.[176]

¶ 128 The principle that a passive retailer may be held liable for breach of an express warranty is even more firmly established. Implied indemnity, in other words, was never available to a retailer who breached an express warranty.[177] And claims for breach of

---

("Failure-to-warn liability is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances . . . .").

[176] I acknowledge a contrary line of cases. In a few jurisdictions the courts retained passive immunity in the products liability arena despite their abolition of the distinction between passive and active fault in other contexts. *See, e.g.*, *Angelus Assocs. Corp. v. Neonex Leisure Prods., Inc.*, 167 Cal. App. 3d 532 (1985), *abrogated in part by Far W. Financial Corp. v. D & S Co.*, 46 Cal. 3d 796, 805 (1988); *Rogers v. Dorchester Assocs.*, 300 N.E.2d 403 (N.Y. 1973), *abrogated in part by Medina v. Milt Holdings*, 131 A.D.3d 121, 127 (2015). But these courts based this decision on a premise that cannot stand under the LRA—the notion that a passive retailer's liability is purely vicarious in nature. *See Angelus Assocs.*, 167 Cal. App. 3d at 541–42 (concluding that because a passive retailer "is neither a wrongdoer not a tortfeasor" comparative fault could not apply); *Rogers*, 300 N.E.2d at 409–10 (holding that the "rule of apportionment" did not apply to passive parties because they "are only vicariously liable"). That premise cannot hold as a matter of Utah law. As noted above and reinforced in our recent decision in *Graves*, the LRA's notion of "fault" encompasses all acts, omissions, and breaches of duty that proximately cause injury. *See Graves*, 2015 UT 28, ¶ 49; UTAH CODE § 78B-5-817(2). Because a retailer's liability is based on such "fault" (on the sale of an unreasonably dangerous product or the failure to warn of its dangers), and not on the retailer's mere relationship with the manufacturer, *see M.J. v. Wisan*, 2016 UT 13, ¶¶ 38–39, 371 P.3d 21 (acknowledging that liability based purely on a relationship falls outside the LRA), the retailer cannot escape liability under the premise of the above cases.

[177] *See, e.g.*, *Cent. Motor Parts Corp. v. E.I. duPont deNemours & Co.*, 596 A.2d 759, 762 (N.J. Super. Ct. App. Div. 1991) ("Costs incurred by a retailer in defense of its own active negligence or independent warranties are not recoverable . . . ."); *In re Consol. Vista Hills Retaining Wall Litig.*, 893 P.2d 438, 443 (N.M. 1995) (noting that "[a]ctive conduct 'is found if an indemnitee . . . has failed to perform

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

express warranty have been preserved even in states that have adopted the doctrine of passive retailer immunity.[178]

¶ 129 As in *Graves*, it may perhaps be said that the manufacturer's acts or omissions are "categorically different"—and even inherently more blameworthy—than those of the passive retailer. 2015 UT 28, ¶ 71. But under our law a "factfinder could easily apportion" responsibility to even the passive acts of a retailer.[179] *Id.* And the LRA accordingly leaves the relative apportionment of fault between the two tortfeasors to the factfinder.

III

¶ 130 To the above extent I agree with the majority's ultimate conclusion that the LRA abrogates passive retailer immunity. But that is because I think it is at least possible that a factfinder, in an appropriate case, could attribute fault to a passive retailer. It is not,

---

a precise duty which the indemnitee had agreed to perform'" (citation omitted)).

[178] *See, e.g.*, *Transcon. Ins. Co. v. Briggs Equip. Tr.*, 321 S.W.3d 685, 702 (Tex. App. 2010) (refusing to grant summary judgment because a genuine dispute of fact existed as to whether the employee of the passive retailer had made an "express factual representation" which the plaintiff had relied on); *Thomas E. Moore, Inc. v. CVN Cos. Inc.*, C.A. No. 89C-JN-7, 1992 WL 302232, at *1 (Del. Super. Ct. Oct. 5, 1992) (noting that immunity was "unavailable to the defendant if express warranties are made and then breached"); *Carter v. Brighton Ford, Inc.*, 251 P.3d 1179, 1183 (Colo. App. 2010) (concluding that because "the concepts of warranty and product liability dealt with two separate theories of harm[,]" Colorado's passive retailer immunity act did not apply to warranty claims).

[179] This point is emphasized by the availability of apportionment of relative fault to a consumer. As with the passive retailer, it may perhaps be said that the consumer's fault, if any, pales in comparison to the responsibility of the manufacturer in selling an unreasonably dangerous product. But our law leaves open the possibility of allocation of fault to the consumer. *See* UTAH CODE § 78B-5-818(4)(a) (requiring the factfinder to allocate relative fault to, among others, the "person seeking recovery"); *id.* § 78B-6-705 (providing that "[f]or purposes of Section 78B-5-818, fault shall include an alteration or modification of the product"). With that in mind, it would be anomalous to categorically exclude the possibility of allocation of any fault to the passive retailer.

Lee, A.C.J., concurring in part and concurring in the judgment

as the majority asserts, because the LRA has preserved the joint and several liability scheme often associated with strict liability. *See supra* ¶ 47. And I would interpret the LRA to leave the question of fault to the factfinder—even in strict liability cases—in a manner that is inconsistent with the notion of blanket immunity for a passive retailer. For these and other reasons, I disagree with the majority's position that a passive retailer may initiate a separate suit against the manufacturer under the law of implied indemnity.

¶ 131 As noted, I believe the foundation of the LRA is the requirement of a single suit in which every person who could be charged with fault is considered in a unitary proceeding aimed at global attribution of comparative fault. Because that unitary determination of comparative fault encompasses not just parties to the suit but any individual who can be identified and for whom there is a "factual and legal basis to allocate fault," UTAH CODE § 78B-5-819(1), the LRA forecloses the need for satellite suits aimed at equitable reallocation of such fault.[180]

¶ 132 This is not unique to the LRA. It is the implicit effect of a legal regime that calls for a comparative allocation of fault in a single legal proceeding. "In a state following comparative contribution, or contribution according to the comparative fault of the parties, contribution may tend to merge with indemnity," and "[t]he eventual outcome is likely to be a single remedy based on comparative fault." RESTATEMENT (SECOND) OF TORTS § 886A cmt. l (AM. LAW INST. 1979); *see also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 51, at 343 (5th ed. 1984) (noting that any "rule that gives one tortious actor a right of indemnity from another tortious actor[] may be held inapplicable after the principle of comparative fault has been adopted").[181]

---

[180] *See* 3 OWEN & DAVIS ON PRODUCTS LIABILITY § 23:15 (4th ed. 2017) (noting that "indemnity is not necessary as a means of fairly allocating responsibility for product related injuries" in jurisdictions that allow apportionment of responsibility).

[181] *See also Nat'l Serv. Indus., Inc. v. B.W. Norton Mfg. Co.*, 937 P.2d 551, 554–55 (Utah Ct. App. 1997) (reaching the same conclusion under the LRA; citing the RESTATEMENT (SECOND) OF TORTS and PROSSER AND KEETON ON THE LAW OF TORTS); *Casey v. Westinghouse Elevator Co.*, 651 F. Supp. 258, 262 (S.D. Ill. 1986) (concluding that adoption of proportionate liability obviated the need for separate actions for implied indemnity); RESTATEMENT (THIRD) OF TORTS:

(Continued)

Lee, A.C.J., concurring in part and concurring in the judgment

¶ 133 The LRA includes two provisions, moreover, that refer expressly to the law of contribution and indemnity. *See* UTAH CODE § 78B-5-820(2) ("A defendant is not entitled to contribution from any other person."); *id.* § 78B-5-823 ("Nothing in Sections 78B-5-817 through 78B-5-822 affects or impairs any right to indemnity or contribution arising from statute, contract, or agreement."). I read these provisions as reinforcing the key premise of the Act—that comparative fault is to be allocated in a single, unitary proceeding under the LRA, and not in separate suits for contribution or indemnity.[182]

¶ 134 The point of the first-cited provision is straightforward. Independent actions sounding in the law of "contribution" are expressly foreclosed. UTAH CODE § 78B-5-820(2). That makes good sense in light of the above. The rights of contribution and indemnity were aimed at allowing a single tortfeasor subject to joint and several liability for a joint tort to seek proportionate compensation from a fellow tortfeasor.[183] And the LRA obviates the need for any such subsequent suit by requiring the comparative proportion of liability for each joint tortfeasor to be allocated in a single suit. Section 78B-5-820(2) thus makes explicit what is already implicit elsewhere in the LRA. Actions for any contribution are foreclosed because they are

---

APPORTIONMENT LIAB. § 22 cmt. e (AM. LAW INST. 2000) (noting that indemnity is "inconsistent with the goals of comparative responsibility").

[182] The relevant Black's Law definition of "contribution" includes a "tortfeasor's right to collect from joint tortfeasors when—*and to the extent that*—the tortfeasor has paid more than his or her proportionate share to the injured party, *the shares being determined as percentages of causal fault*." BLACK'S LAW DICTIONARY 378 (9th ed. 2009) (emphases added). And our common law indemnity doctrine functions only to allow a joint tortfeasor full reimbursement when another joint tortfeasor is *wholly* at causal fault for a third-party's injury. *See supra* ¶ 63. So the elimination of the right to seek contribution appears to eliminate common law claims for both "contribution" and "indemnity."

[183] *See* RESTATEMENT (SECOND) OF TORTS § 886B cmt. a (AM. LAW INST. 1979) ("A suit for contribution is brought for the recovery of a proportionate part of the sum paid by the plaintiff, on the ground that the parties were both guilty of negligence and should share the cost; the parties being equally guilty . . . .").

Lee, A.C.J., concurring in part and concurring in the judgment

unnecessary under a regime in which comparative fault is allocated globally in a unitary statutory proceeding.

¶ 135  The second-cited provision, Utah Code section 78B-5-823, is a bit less clear. It provides that "any right to indemnity or contribution arising *from statute, contract, or agreement*" is not foreclosed by the LRA. UTAH CODE § 78B-5-823 (emphasis added). The italicized terms are significant. They provide the grounds for reconciling section 823 with section 820(2): Although a common law right of contribution or indemnity is foreclosed by statute, a right of indemnity or contribution "arising from statute, contract, or agreement" is not. *Id.*

¶ 136  The distinction is premised on a key difference between the common law action for contribution on one hand and statutory or contract-based principles of indemnity or contribution on the other. The former, as noted above, is premised on a principle of comparative fault. A single tortfeasor held jointly and severally liable for 100 percent of a plaintiff's damages could seek proportionate contribution from a second joint tortfeasor in an action for common law contribution. And the premise of such an action was a concern for the inequity or arbitrariness of a single tortfeasor being fully liable for harm that was only partially caused by his action.[184] This sort of action, as explained above, is foreclosed by the LRA.

¶ 137  But statutory and contract-based actions are different. They are generally premised on something other than an equitable assessment of the parties' proportionate or comparative fault.[185] A manufacturer, for example, could enter into a contract with a retailer in which the latter agrees to accept any responsibility assigned in a tort suit to the manufacturer. And if the manufacturer is deemed 90 percent at fault in a products liability suit advanced by a consumer, the LRA would not foreclose a subsequent suit for contractual

---

[184] *See Kennedy v. Camp*, 102 A.2d 595, 600 (N.J. 1954) (explaining that contribution is based on the premise that "no one ought to profit by another man's loss; where he himself has incurred a like responsibility").

[185] *See Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1077 (Fla. Dist. Ct. App. 2003) (noting that "contractual indemnity is not concerned with 'special relationships' or vicarious, constructive, derivative or technical liability; it is concerned with the express terms of the agreement to indemnify").

Lee, A.C.J., concurring in part and concurring in the judgment

indemnity or contribution by the manufacturer against the retailer.[186] Such a suit, after all, would be purely contract-based. And because it would not be premised simply on reallocating comparative fault between the manufacturer and the retailer—but instead on vindicating the manufacturer's contractual rights—the suit would be consistent with the LRA's requirement of a single, unitary proceeding for allocating comparative fault.

¶ 138  I would interpret the LRA to embrace this exception to the general prohibition on independent suits for common law contribution or implied indemnity. The general rule is that separate suits are barred to the extent they are premised on common law principles of equitable allocation of comparative fault. But an exception applies to actions under a statute or contract that are not based on a simple reallocation of fault.

IV

¶ 139 For the above reasons I would reverse the decision granting R.C. Willey's motion to dismiss and vacate the denial of the fee request submitted by the Bylsmas. In so doing I would reject the passive retailer doctrine and overrule the court of appeals' decision in *Sanns v. Butterfield Ford*, 2004 UT App 203, 94 P.3d 301. But I would do so based on the scheme established by the LRA and not on preempted principles of the common law of strict products liability. And I accordingly would hold that the LRA eliminates common law indemnity and contribution actions.

––––––––––––

[186] By statute, a contractual provision requiring a purchaser of a product to indemnify a manufacturer is "void and unenforceable" in certain circumstances. UTAH CODE § 78B-6-707. That implies that contractual indemnification clauses are presumptively valid as between a manufacturer and anyone other than "a purchaser or end user." *See also Blaisdell v. Dentrix Dental Sys., Inc.*, 2012 UT 37, ¶¶ 8–9, 284 P.3d 616 (citation omitted) (narrowly construing the application of this provision).